Defendant, City of Birmingham, appeals from a trial court's decree enjoining the City's maintenance of certain public and private nuisances and from a judgment awarding four individuals an aggregate of $13,000.00 in damages. We reverse and remand.
Plaintiff, the City of Fairfield, sought a permanent injunction to restrain Birmingham from "collecting and diverting surface waters . . . into drains, pipes, conduits or artificial channels and precipitating and casting such surface waters in increased quantity, volume, and velocity" onto the streets of Fairfield and upon the property of the citizens of Fairfield. The complaint characterized the conditions complained of as a public nuisance and sought an award of money damages in addition to abatement (by injunction) of the nuisance. Approximately one year after the complaint was filed, several Fairfield residents were allowed to intervene under ARCP 24 as parties plaintiff. They too sought both injunctive relief and money damages.
Evidence at the trial court level was taken before two special masters appointed by the court under Rule 53, ARCP. In general the record reveals that, prior to 1971, there was a flooding problem in the Mechanicsville area of Birmingham. It appears that this flooding resulted from the overflowing of a natural drainage ditch utilized by Birmingham in its storm drainage system. *Page 440 
For many years the open ditch has run to the Birmingham city limits, where it connects with a 36-inch pipe which is located at the beginning of Fairfield's storm drainage system. Several Mechanicsville residents (whose property had become flooded when the ditch overflowed) sued Birmingham, seeking both injunctive relief and damages. That suit was settled when Birmingham agreed to improve the system in the Mechanicsville area by putting pipes in the ditch and covering them. The improvements were made in late 1970 and early 1971, culminating with a 66-inch pipe terminating near the Birmingham-Fairfield boundary. From the point where the Birmingham pipe ends, the open ditch continues for approximately 15 feet to the Fairfield city limits; at that point the ditch joins the 36-inch pipe that represents the inception of Fairfield's storm sewer system.
The improvements were successful in alleviating the flooding problem in the Mechanicsville section of Birmingham, but apre-existing flooding problem in Fairfield was aggravated to some degree due to the increased rate of flow through the 66-inch pipe. This increased flooding in Fairfield is the subject of this action.
Apparently Fairfield's 36-inch pipe cannot handle all of the water flowing into it from the ditch at the end of the Birmingham system. During relatively heavy rains, storm water flows over the banks of the ditch and onto Avenue H in Fairfield; the water eventually collects on the private property of some of the Fairfield residents who intervened in this action.
At the conclusion of the evidence, the special masters made detailed findings of fact and conclusions of law which may be summarized as follows:
Fairfield's storm drainage system was inadequate at its inception and no flooding would occur if Fairfield had an adequate system. On the other hand, the Birmingham improvements were soundly constructed in accord with good engineering practices. The area now drained by the two systems is the same as it was before the improvements were made, but the new Birmingham pipe "had the result of shifting a flooding problem downstream, thereby aggravating an infrequent existing flooding problem downstream [in Fairfield]." Since the installation of the improvements, the flooding has increased in frequency and severity due to the fact that a smaller storm now has the same flooding effect that a more severe storm had before the new pipe was installed; the capacity of Fairfield's 36-inch pipe is now reached more quickly as a consequence of the increased and more efficient discharge of water that was made possible by the Mechanicsville improvements.
The masters concluded that "the increased flooding caused by the increased rate of discharge and decrease in the time of concentration constitutes a public nuisance and a private nuisance" (to four of the intervenors) and that the nuisances should both be abated. The masters also recommended that damages be awarded to the four prevailing intervenors.
After the masters report was submitted to the trial court, over defendant-Birmingham's objection the report was wholly confirmed and adopted by the court. Birmingham was permanently enjoined from continuing to maintain the condition deemed a public and private nuisance and was ordered to pay intervenor Watkins $10,000.00 and to pay intervenors Cherry $3,000.00. Birmingham appeals on several grounds.
 I
Defendant Birmingham principally contends that the trial court erred in ordering the abatement of the condition that was deemed to be a nuisance. The thrust of defendant's argument is that no abatable nuisance can arise from the doing of statutorily authorized acts if the acts themselves are done in a proper manner. Because municipalities are given express statutory authority to make all needful drainage improvements(see Code of 1975, § 11-50-50), Birmingham asserts that a nuisance resulting from sewerage improvements may not properly be ordered abated in the absence of both allegations and proof
of negligence *Page 441 
in the construction, operation or maintenance of the improvements. Birmingham contends that negligence was neither pleaded nor proved and that the complaint therefore should have been dismissed.
It is true that neither the original complaint nor the intervenors' complaint charged Birmingham with "negligence"; instead, both alleged that Birmingham was guilty of creating and maintaining a "nuisance." The nuisance allegation was sufficient to give Birmingham notice of what Fairfield's claim was and the grounds upon which it was based; under our Rules of Civil Procedure, that is all that is necessary. E.g., Carter v.Calhoun County Board of Education, Ala., 345 So.2d 1351 (1977). The term "nuisance" refers "to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." Prosser, Handbookof the Law of Torts § 87 (4th ed. 1971). Although a nuisancemay result from acts or omissions that constitute negligence, a nuisance may also result from non-negligent (or even lawful) conduct; the terms nuisance and negligence are commonly thought of as denoting distinct torts. See Terrell v. Alabama WaterService Co., 245 Ala. 68, 15 So.2d 727 (1943). In this instance, although plaintiffs did not specify with particularity the character of the conduct giving rise to the condition claimed to be a nuisance, they did state what the conduct itself consisted of and the result of that conduct. Such allegations sufficiently comply with ARCP 8 (a)(1), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." We are unable to say that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"; as a result it was proper not to dismiss the complaint for failure to state a claim. See Conley v. Gibson,355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Watwood v. R.R. DawsonBridge Co., Inc., 293 Ala. 578, 307 So.2d 692 (1975).
However, by relieving plaintiff and intervenors of the burden of making a ceremonial averment of negligence, we have not relieved them of the burden of proving that the "nuisance" was produced by the negligent acts or omissions of defendant Birmingham, for our prior decisions consistently support defendant's contention that proof of negligence is required to sustain injunctive relief ordering abatement of a nuisance when the conduct giving rise to the conditions complained of was expressly authorized by legislative act.
"A `nuisance' is anything that works hurt, inconvenience or damage to another. The fact that the act done may otherwise be lawful does not keep it from being a nuisance. . . ." Code of 1975, § 6-5-120. If a particular activity falls under the general definition of a nuisance and, additionally, "damages all persons who come within the sphere of its operation," it will be deemed a public nuisance (Code of 1975, § 6-5-121), which is generally abatable by a city when it injures "the health, morals, comfort or welfare of the community or any portion thereof." Code of 1975, § 6-5-122. Such a public nuisance may also give an individual a cause of action for abatement when he has suffered damages different in degree and kind from those suffered by the general public. See Barnes v.Kent, 292 Ala. 508, 296 So.2d 881 (1974). However, theabatement remedy is limited when the conduct giving rise to the damage is statutorily authorized. The rule of our cases is that "[t]here can be no abatable nuisance for doing in a proper manner what is authorized by law." Fricke v. City ofGuntersville, 251 Ala. 63, 36 So.2d 321 (1948).
A number of our statutes specifically confer upon cities the power to engage in certain activities; for example, cities are expressly given the power to own and control city cemeteries (Code of 1975, § 11-47-40), the power to establish and maintain garbage incinerators, § 11-47-135, the power to establish, control and regulate slaughterhouses, § 11-47-138, etc. Municipalities are also given the power to provide for their own drainage via sewers and other means. Code of 1975, §11-50-50 provides: *Page 442 
 All cities and towns may make all needful provisions for the drainage of such city or town, may construct and maintain efficient sanitary and stormwater sewers or sewer systems, either within or without the corporate limits of the city or town, may construct and maintain ditches, surface drains, aqueducts and canals and may build and construct underground sewers through private or public property, either within or without the corporate limits of such city or town, but just compensation must first be made for the private property taken, injured or destroyed.
It is clear that the exercise of any of the foregoing powers could result in injury to the person or property of another so as to fall within the purview of our broad statutory definition of a nuisance; it is also clear, however, that the drastic remedy of abatement by injunction is not available to an injured party unless the authorized instrumentality wasnegligently constructed or maintained:
 [T]he construction and operation of a governmental agency by authority of law, constructed and operated exactly as authorized by law and strictly in accordance with good practice, cannot be a nuisance in law, though it may work damage to others. [Downey v. Jackson, 259 Ala. 189, 65 So.2d 825 (1953).]
Fricke v. City of Guntersville, supra, was a suit to compel defendant Guntersville to fill or cover a drainage ditch that bounded plaintiff's property. The ditch was constructed to divert surface water so that the water would not continue to injure the property of landowners on the same block as plaintiff. Plaintiff's evidence tended to prove that the ditch deprived him of access to his property on the side where the ditch was located and that his property was also being deprived of support on that side. Noting that the city had received advice from competent engineers concerning the feasibility of the ditch and that the formerly flooded landowners had greatly benefited from its construction, this Court affirmed the trial court's judgment denying relief to the plaintiff. We held that "there can be no abatable nuisance for doing in a proper manner what is authorized by law"; because municipalities are, by statute, given express authority to make all needful drainage improvements, conditions that result from such improvements may not be ordered to be abated unless the improvements were made in an improper manner.
In Harris v. Town of Tarrant City, 221 Ala. 558, 130 So. 83
(1930), defendant Tarrant City had constructed a drainage ditch adjacent to plaintiff's property. Plaintiff contended, interalia, that during rainy seasons the ditch overflowed and thereby caused injury to his property. Plaintiff characterized his claim as being for an abatable nuisance. This Court disagreed (at 221 Ala. 560, 130 So. 85):
 [W]hen a city in the exercise of its duty adopts a system of drainage to care for the rainwater and constructs storm sewers or ditches for that purpose . . . it would be treated as of such character as to be embraced in section 235 [of the Constitution] and could not ordinarily be abated, but it would subject the city to liability for such compensation as is contemplated by the Constitution. But for the negligent maintenance of such sewers and ditches resulting in damages, the liability would not necessarily be controlled by the nature of the structure. The damages for the construction of the improvement is as though it were permanent for that it is not abatable. But for an improper or negligent maintenance the rule applicable to an abatable condition has application. [Emphasis added.]
A third case dealing with the same general subject is City ofHuntsville v. Miller, 271 Ala. 687, 127 So.2d 606 (1961). In that case, an individual sought to enjoin as a nuisance the deposit by the city of surface waters on his land. The trial court denied injunctive relief but awarded damages to plaintiff. On appeal this Court held that the equity court had improperly retained jurisdiction after denying all equitable relief; it was, therefore, improper to grant legal relief,i.e., damages, after denying the equitable *Page 443 
relief sought. (The distinction made between law and equity would be unimportant today. See ARCP 2.) On rehearing, we considered the specific question whether "the maintenance by the City of an already existing system for the drainage of surface waters which causes injury or damage to another's land [is] subject to abatement in equity." Relying principally onHarris v. Tarrant City, supra, we held that the question should be answered in the negative. Because there was no proof ofnegligence in the construction or maintenance of the drainagesystem that emptied surface waters into the ditch that ran through plaintiff's property, this Court held that injunctive relief was properly denied.
These and a host of other cases make it clear that injunctive relief is not properly granted to prohibit as a nuisance, the results of statutorily authorized municipal improvements unless the improvements were negligently constructed or maintained. The undisputed evidence in the instant case is that Birmingham's improvements were not negligently designed, constructed, or maintained; indeed, both engineering expertscalled on behalf of plaintiff City of Fairfield testified to that effect. In addition, the report of the special masters, which was adopted by the trial court, states, "The Mechanicsville improvements are soundly engineered and used good engineering practice up to the termination of the 66" pipe into an open ditch." In light of the evidence and the masters' findings considered above, we are unable to state that there was any evidence that any negligence on the part of Birmingham caused the conditions which were deemed to constitute a nuisance. As a result, we must reverse the trial court's order granting injunctions to plaintiff Fairfield and to the individual intervenors. Although the general rule is that the power to grant or refuse to grant an injunction rests in the sound discretion of the trial court under the facts of the particular case, see Odess v. Taylor, 282 Ala. 389,211 So.2d 805 (1968), it is clear that the trial judge's discretion is not unlimited; as we have stated in a prior decision:
 "The discretion exercised by the trial court is, however, a legal or judicial one which is subject to review for abuse or improper exercise, as where there has been a violation of some established rule of law . . . or a clear misapprehension of the controlling law * * * and, where an abuse of discretion is clearly made to appear, the appellate court will reverse the order or decree. * * *" (Emphasis supplied.) [Lorch, Inc. v. Bessemer Mall Shopping Center, Inc., 294 Ala. 17, 310 So.2d 872 (1975).]
The trial court, in granting the injunctive relief requested, did not rule in accord with the principles of law enunciated inFricke v. City of Guntersville, supra, and the other cases mentioned earlier. For that reason the decree granting injunctive relief to the plaintiffs must be reversed.
Although plaintiff and intervenors contend on appeal that the facts proved at the trial court level were sufficient to enable the court to find that Birmingham was negligent (or even wilful) in terminating the sewer system where it did, it is obvious from the record that the case was not tried on any sort of negligence theory. Indeed, plaintiffs' counsel stated on the record that "the issue in this case, of course, is not one of any negligence, but is whether or not a public nuisance exists, which is not grounded on negligence." Because we are not at liberty to review a case on a theory different from that on which it was tried below, see Bailey v. City of Mobile,292 Ala. 436, 296 So.2d 149 (1974), this cause may not now be considered to have been originally predicated on a negligence theory (as was required to enable the trial court to grant injunctive relief in a case of this type).
Should our decision in City of Mountain Brook v. Beatty,292 Ala. 398, 295 So.2d 388 (1974), be considered as conflicting with our decision here, we point out that the cases are distinguishable. In the Mountain Brook case we held that the City's acquisition of a prescriptive easement for drainage over plaintiffs' private property did not carry with it the right to flood the plaintiffs' adjacent land; only if the flooding had *Page 444 
continued over the prescriptive period could the City have acquired such a right by prescription. The easement acquired extended only to the right to drain, and the City was subject to a duty to maintain the ditch being used in such a fashion that adjacent property would not be unduly burdened.
This case differs in two significant respects. First, the focus here is not on the rights and duties which arise as a result of the creation of an easement over private property. It is clear that Birmingham has no easement over Fairfield's property, nor over that of the intervenors, and none is claimed. Second, Mountain Brook did not turn upon the liability of a municipality when it acts under statutory authority to create municipal drainage improvements. Indeed, the precedents on which this Court relied for that decision were not those relevant under the issues here. Thus the Mountain Brook
decision is not apropos in this instance.
It is noteworthy that the original parties in the instant case are municipal corporations. Their problems induced by their interrelated drainage systems, perhaps common to the problems of other Alabama cities, do not lend themselves to complete resolution judicially because those systems are not necessarily separate, isolated, self-contained units enabling each individual municipality to dispose of its drainage in any fashion it desires. Instead, the sewer systems of contiguous municipalities frequently interconnect so that the improvement
of its system by one city (and the resulting increase in efficiency) may substantially increase the existing burden on its neighbor. The neighboring city, even if its drainage system was initially adequate, could find itself (through no fault of its own) left with an inadequate system. The problem is further complicated by the fact that a duty to provide a proper
sewerage system to its citizens is imposed by legislative enactment on a city whenever it undertakes to provide any such system. E.g., City of Birmingham v. Crane, 175 Ala. 90,56 So. 723 (1911).
As a Court our function is to effectuate the intention of the legislative branch as that intention is manifested in statutory enactments. The legislative statutes have permitted municipal corporations to construct, maintain and extend their drainage systems for the benefit of their citizens. A city which has provided an efficient, properly constructed and maintained sewerage system may not be subjected to injunctions ordering abatement of adverse conditions which have resulted in other municipalities by virtue of the proper construction and maintenance of the system. The anomalies made possible by the effect of such legislative permission upon municipalities sharing the same watershed, however, appear to require additional legislative attention, as the case before us demonstrates.
 II
As we have indicated earlier in this opinion, a number of individual Fairfield residents were permitted to intervene in this action as plaintiffs. Four of the intervenors were awarded a total of $13,000.00 in damages (in addition to the injunctive relief granted); Mr. Watkins' damages were assessed at $10,000.00, and three members of the Cherry family were awarded $3,000.00. These judgments are due to be, and are, reversed.
By statute, persons having claims against the City of Birmingham are required to file their claims with the city clerk "within one year of the accrual thereof . . . or the same shall be barred; and no claim against the city shall be sued on until ten days after a statement of same has been filed with the city clerk." Ala. Code tit. 62 § 657 (1958). In this case, the intervenors filed notarized claims with the clerk on November 13, 1975. The claims of Mr. Watkins and the Cherry family were very similar: both concerned "Flood damages to real property" and alleged that the damages were sustained "on June 29, 1975, and prior thereto." The damages claimed were stated to include "the actual physical damage done to my [our] property, as well as the inconvenience caused me [us], as well as *Page 445 
loss of use of the property due to its inaccessibility during flood stage." The intervenors' complaint adopted by reference the claim that was filed with the clerk and properly alleged compliance with the Birmingham "nonclaim" statute, Ala. Code
tit. 62 § 657 (1958).
The problem, however, is that there was no proof of damage sustained during the year immediately preceding the presentation of the claims to the city clerk (as is required).See City of Birmingham v. Ingram, 20 Ala. App. 444, 103 So. 595,cert. den. 212 Ala. 552, 103 So. 599 (1925). The evidence taken before the masters clearly shows that the intervenors' claims accrued before November 14, 1974; those claims are therefore barred under Title 62, Section 657 of the 1958 Code.
Mr. Watkins testified that he had his house appraised in1969; he estimated that its value had decreased since that time
by about $10,000.00. Intervenor Watkins further stated that he had major flooding in his basement on only two occasions — in 1966 and 1972. After 1972, Mr. Watkins had no flood damage at all, although the property apparently still flooded on occasion. Mr. Cherry testified at trial that his property was flooded on three occasions in 1973 and once in 1975. The water only went under his house in 1973.
It is obvious from their testimony that neither Mr. Watkins nor Mr. Cherry proved that they suffered any damage from November 14, 1974 to November 13, 1975 (the day the claim was filed); their claims accrued, at the latest, in 1973. The variance between the statement of their claims (for damages sustained "on June 29, 1975 and prior thereto") and the evidence offered in support thereof is fatal to their actions for damages. See City of Anniston v. Rosser, 275 Ala. 659,158 So.2d 99 (1963); Benton v. City of Montgomery, 200 Ala. 97,75 So. 473 (1917). Because we hold that intervenors' failure to comply with the nonclaim statute warrants reversal, we do not reach the question whether intervenors could have proven that they suffered any legal damages due to the increased flooding allegedly caused by Birmingham. The trial court's award of damages to the specified intervenors was plainly and palpably wrong because it was contrary to the evidence. Therefore this cause must be, and is, reversed and remanded.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX and SHORES, JJ., concur.
JONES, J., concurs in the result.