889 P.2d 185

STATE of New Mexico, ex rel., VILLAGE OF LOS RANCHOS DE ALBUQUERQUE, Kenneth M. Bull, Beverley Bull, Bill Douglas, Barbara Douglas, Beverly Goss, Frederick Gurule, Patricia Gurule, Robert Hall, Lorna Hall, Larry Harris, Terrence Keyes, Janice Keyes, David McArthur, Beverley McArthur, Maureen McGuinness, George Patterson, Connie Patterson, R.D. Robinett, Jr., Dorothy Robinett, Richard Robinson, Nancy Robinson, Katherine Rust, Lois Seibel, Tom Sorensen, Joann Sorensen, John Ulrich, Lisa Ulrich, Jack Whitten, and Stella Whitten, Plaintiffs–Respondents,

v.

CITY OF ALBUQUERQUE, Defendant–Petitioner.

No. 21813.

Supreme Court of New Mexico.

Dec. 14, 1994.

Rehearing Denied Jan. 26, 1995.

Robert White, City Atty., Edward R. Pearson, Asst. City Atty., Albuquerque, for petitioner.

Walker & van Heijenoort, William G. Walker, Albuquerque, for respondents.

Robert J. Aragon, Ron Sanchez, Albuquerque, for amicus curiae Neighborhood Ass'n.

Nicholas F. Persampieri, Jr., Albuquerque, for amicus curiae Sierra Club, et al.

## OPINION

FROST, Justice.

The City of Albuquerque (City) proposes to build the Montaño Bridge across the Rio Grande River. The Village of Los Ranchos de Albuquerque (Village) seeks to prevent construction of the bridge, claiming it will be a public nuisance in fact. We conclude that (1) within specific limits, the planning and construction of municipal public works projects are subject to review by the courts; (2) issues remain unresolved in establishing whether the Montaño project is duly authorized; (3) if the law so provides, one municipality can establish its own public works project within another municipality; (4) anticipatory nuisance can in some circumstances be a valid cause of action against a municipal public works project; (5) but a public works project that is duly authorized cannot be an anticipatory public nuisance in fact.

## I. FACTS

The Rio Grande River flows south passing through the City of Albuquerque. Parallel to the river and a short distance from its east bank runs the Albuquerque Riverside Drain—a ditch that carries runoff from the acequias or irrigation channels in the area. Abutting the Drain and north of the City limits lies the Village of Los Ranchos de Albuquerque, a municipality that was incorporated in 1958. The City seeks to build a bridge connecting Montaño Street on the east side of the river with Coors Road on the west side. This Montaño Bridge project would cut through the southern tip of the Village and is opposed by its residents.

The Montaño project was initiated in the mid-1960s when the City began studies to determine the feasibility of constructing one or more crossings over the Rio Grande to facilitate travel between the east and west portions of the City. In 1965 the Major Street and Highway Plan showing a proposed future river crossing at Montaño was presented to the City Council of Albuquerque. During the mid-1970s various agencies including the Albuquerque Planning Department and the Urban Transportation Planning and Policy Board (UTPPB) of the Middle Rio Grande Council of Governments of New Mexico made plans and studies and evaluated alternative sites for river crossings.

In January 1979 federal agencies first became involved when the UTPPB asked the Federal Highway Administration (FHWA) for help in preparing an Environmental Impact Statement (EIS) though the Montaño project did not legally require one. The FHWA took an active role in the lengthy and complex preparation of the EIS which took more than four years to complete.

Meanwhile, in May 1980 the UTPPB, in conjunction with the New Mexico State Highway Department, evaluated various bridge sites. The UTPPB also appointed a citizens advisory committee and a government agency committee and held public hearings. By November 1980 the UTPPB issued its Long Range Major Street Plan which concluded two bridges were needed: one at Montaño Road and one further north connecting with a road called Paseo del Norte. Construction of the Paseo Bridge was completed in 1986.

In November 1982 the Middle Rio Grande Conservancy District (Conservancy District) and Bernalillo County each agreed to permit the City to annex properties they held within the Village boundary. Soon thereafter, on December 12, 1982, the City passed an ordi-

nance annexing both properties. This had the effect of placing the entire Montaño Bridge right-of-way—including the part that passed through the Village—within the City limits. The legality of this annexation was upheld by *Clark v. City of Albuquerque*, No. 9625, slip op. at 2–3 (N.M.Ct.App. Aug. 9, 1988), *cert. denied*, 107 N.M. 587, 761 P.2d 1292 (1988).

As mentioned above, the federally assisted EIS took more than four years to complete and on September 16, 1983, a Final Environmental Impact Statement for the river crossings project was approved by the FHWA. The City then programmed a general obligation bond for $4.2 million for general road improvements that was approved by the City voters in 1983.

In January 1984 the City announced its intention to proceed with the Montaño project and on August 30 of the same year *Village of Los Ranchos de Albuquerque v. Barnhart* was filed in federal court. This case, appealed as 906 F.2d 1477 (10th Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991), established that federal involvement in the Montaño project was not sufficient to warrant protection under various federal environmental and historic preservation statutes.

An additional $6.1 million earmarked for the project was approved by City voters in 1985. Prior to beginning the project, the City applied for a permit from the United States Army Corps of Engineers (Corps) to construct the bridge. The permit is known as a "404 Permit" because it is required under a statute enacted as Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 884 (1972) (codified as amended at 33 U.S.C. § 1344 (1988, Supp. IV 1992 & Supp. V 1993)). The 404 Permit was necessary because construction of the bridge will require fill materials to be temporarily placed in navigable waters of the United States. Section 1344(a).

Because the Montaño project would affect properties included in the National Register of Historic Places, the Corps, on June 6, 1987, entered into a Memorandum Agreement with the New Mexico State Historic Preservation Office. Among other matters, the Memorandum agreed that the 404 Permit would consider the impact of the project on historic and archaeological sites, would limit the bridge to two lanes, prohibit heavy commercial traffic, and would mandate the construction of noise barriers. A month later, on July 6, 1987, the 404 Permit was issued. In addition to the matters in the Memorandum, the Permit specified the methods of dredging and filling the Rio Grande River, indicated the kinds and placements of pilings, and required completion of the project by December 31, 1995. Special provisions were included to assure that the project avoid as much as possible the destruction of the bosque—the small forests of cotton woods and other vegetation that border the Rio Grande. The bridge will destroy about four acres of the 800 acres of bosque and divide it into two parts. The Permit required the revegetation and installation of brush piles as well as the establishment of "mitigation lands" elsewhere. In federal court the Village challenged the 404 Permit and the City's compliance with various federal laws and regulations. The Village's claims were rejected. *Village of Los Ranchos de Albuquerque v. Marsh*, 947 F.2d 955, 1991 WL 216536 (10th Cir.1991), *aff'd on reh'g*, 956 F.2d 970 (1992) (en banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 59, 121 L.Ed.2d 27 (1993).

## II. PROCEEDINGS

This case commenced on April 4, 1989, when the Village, together with a number of individual citizens, filed suit for injunctive relief to halt the Montaño project. The allegations included a claim that the bridge constituted a public nuisance. On June 16, 1989, the district court, agreeing that the bridge presented potential harm, issued a preliminary injunction. The Court of Appeals, on September 8, 1989, granted an interlocutory appeal to consider six questions certified to it by the district court. Among the Court's conclusions in *City of Albuquerque v. State ex rel. Village of Los Ranchos de Albuquerque*, 111 N.M. 608, 611–18, 808 P.2d 58, 61–68 (Ct.App.1991), *cert. denied*, 113 N.M. 524, 828 P.2d 957 (1992) [hereinafter *City v. Village I* ], were findings that the project was not a nuisance per se, that the injunction should

not have been issued, and that the New Mexico Prehistoric and Historic Sites Preservation Act, NMSA 1978, §§ 18–8–1 to –8 (Cum.Supp.1989) (PHSPA), was inapplicable.

After further proceedings, the district court, on October 17, 1991, found that its jurisdiction was limited to dismissing the action and vacating the preliminary injunction. The Village appealed and the bridge once again came before the Court of Appeals. The Court affirmed dismissal of the claim of nuisance per se but found that a public works project could be subject to anticipatory abatement by injunction as public nuisance in fact. *State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque,* 119 N.M. 169, 173–74, 889 P.2d 204, 208–09 (Ct. App.1993) [hereinafter *Village v. City II* ]. The case was remanded to the district court to consider the Village's request to state a cause of action based upon nuisance in fact and the City's alleged failure to comply with applicable statutes, regulations, or ordinances.

We granted the City's petition for writ of certiorari to consider whether a public works project is subject to abatement as a public nuisance when it has been duly authorized by law and has, pursuant to law, been reviewed and approved by concerned municipal, state, and federal agencies. Though our reasoning may be elaborate, the question presented can be succinctly answered in the negative. We discuss this question in terms of five broad issues: (1) the standards of judicial review to be applied to municipal public works projects; (2) whether the Montaño project is duly authorized; (3) the extent to which one municipality can establish its own public works project within another municipality; (4) whether anticipatory nuisance is a valid cause of action against a municipal public works project; and (5) whether a public works project that is duly authorized can be an anticipatory public nuisance.

## III. STANDARD OF REVIEW

The City raises some complex questions regarding the relationship between municipal authority and review by the courts. With broad declarations like "[t]he general rule is that municipal discretion is beyond the con-

trol of the courts," it seems as if the City would like the courts to recuse themselves from reviewing all municipal decisions.

■ Contrary to such generalizations, the general rule is that, absent a constitutional prohibition, municipal acts are always reviewable by the courts. This applies whether it is an act of the executive branch of the municipal government or a legislative act delegated to the municipality by the state legislature. The reviewability of executive and legislative acts is implicit and inherent in the common law and in the division of powers between the three branches of government. *See, e.g., Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177–79, 2 L.Ed. 60 (1803) ("It is, emphatically, the province and duty of the judicial department, to say what the law is."); *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670–73, 106 S.Ct. 2133, 2135–37, 90 L.Ed.2d 623 (1986) (party wishing to preclude judicial review will bear a heavy burden); *Friends of the Crystal River v. United States Envtl. Protection Agency,* 35 F.3d 1073, 1078 (6th Cir.1994) (discussing strong presumption in favor of judicial review of administrative decisions). This has been so since the birth of Anglo–American jurisprudence. *See Prohibitions del Roy* 12 Co.Rep. 63, 65 (1608) (in which Sir Edward Coke informed King James I that, while he was not subject to other men he was subject to God and the law). We have subject matter jurisdiction to review all executive and legislative acts.

■ This is not to suggest there are no limitations upon this power of review. The scope and timing of that review have specific limits. *See Campbell v. Merit Sys. Protection Bd.,* 27 F.3d 1560, 1564 (Fed.Cir.1994) ("The power of courts to disturb the actions of administrative agencies is generally quite limited."); *In re Angel Fire Corp.,* 96 N.M. 651, 652, 634 P.2d 202, 203 (1981) ("Jurisdiction of the matters in dispute does not lie in the courts until the statutorily required administrative procedures are fully complied with."). To better explain the limits on the scope of our review it is helpful to discuss briefly the discretionary powers of municipalities.

A municipality may exercise only those powers granted to it by the legislature. Joseph A. Joyce & Howard C. Joyce, *Treatise on the Law Governing Nuisances* § 330, at 472 (1906). Municipal powers and duties have been classified as (1) discretionary or legislative, and (2) as mandatory or ministerial. 2 Eugene McQuillin, *The Law of Municipal Corporations* § 10.32, at 1088 (3d ed. 1990). Under the former the city determines the time, manner or occasion of performance, while under the latter the city has no such discretion. *See* 2 *id.* Usually included among municipal discretionary powers is the provision of necessary or desirable public works projects. 2 *id.* at 1090; *see, e.g., State ex rel. Wilcox v. T.O.L., Inc.,* 206 So.2d 69, 72 (Fla.Dist.Ct.App.1968) (planning and construction of county roads and bridges described as within discretion of boards of county commissioners); *but see City of Ottawa v. Illinois,* 48 Ill. 233, 239–40 (1868) (maintenance and repair of bridge held imperative and could be compelled by mandamus).

The New Mexico Legislature has broadly outlined the discretionary powers granted to municipalities:

> The governing body of a municipality may adopt ordinances or resolutions not inconsistent with the laws of New Mexico for the purpose of:
>
> A. effecting or discharging the powers and duties conferred by law upon the municipality;
>
> B. providing for the safety, preserving the health, promoting the prosperity and improving the morals, order, comfort and convenience of the municipality and its inhabitants....

NMSA 1978, § 3–17–1 (Cum.Supp.1994). When public rights and needs come in conflict with other interests, the municipality can exercise its discretionary authority to adopt a public policy whose objective is the greatest public good. *Wilcox,* 206 So.2d at 72.

All the decisions involved in going forth with the Montaño project were arrived at through administrative processes. *See Deaconess Hosp. v. Washington State Highway Comm'n,* 66 Wash.2d 378, 403 P.2d 54, 70 (1965) (en banc) (Hale, J., concurring in part). The standards of review of discretionary municipal decisions are similar to those established for administrative decisions in *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.,* 101 N.M. 291, 681 P.2d 717 (1984); *see generally* 13 McQuillin, *supra,* § 37.255, at 614–15.

We always begin with the presumption that the decision of the municipality is valid. *See Planning & Design Solutions v. City of Santa Fe,* 118 N.M. 707, 710, 885 P.2d 628, 631 (1994). The burden of proving otherwise is on those who claim the decision is invalid. *Olsen v. City of Baton Rouge,* 247 So.2d 889, 895 (La.Ct.App.), *cert. denied,* 259 La. 755, 252 So.2d 454 (1971). Within certain limitations, courts will not interfere with the exercise of municipal powers that are strictly discretionary. 2 McQuillin, *supra,* § 10.33, at 1093–94, § 10.37, at 1104; *see Gomez v. City of Las Vegas,* 61 N.M. 27, 34, 293 P.2d 984, 988 (1956). This is because the discretion to build a bridge within a municipality has been vested by our statutes in the municipality itself. The municipality is most qualified to evaluate engineering problems, traffic patterns, and all the other subtleties involved in such a project. As long as the decisions remain within lawful bounds, the courts will not interfere. *See Elliott v. New Mexico Real Estate Comm'n,* 103 N.M. 273, 275, 705 P.2d 679, 681 (1985).

Thus, as we would for any administrative determination, we will review the evidence in the light most favorable to the City's decision. *See Duke City,* 101 N.M. at 294, 681 P.2d at 720 (quoting *New Mexico Human Servs. Dep't v. Garcia,* 94 N.M. 175, 176–77, 608 P.2d 151, 152–53 (1980)). We will not substitute our judgment for that of the municipal authority. 2 McQuillin, *supra,* § 10.33, at 1093; *see Elliott,* 103 N.M. at 275, 705 P.2d at 681. Where there is more than one sensible opinion, the decision of the municipality will be upheld if it was achieved honestly with all pertinent legal authorization. *See* 2 McQuillin, *supra,* § 10.33, at 1093; *Snyder Ranches, Inc. v. Oil Conservation Comm'n,* 110 N.M. 637, 639, 798 P.2d 587, 589 (1990). The opposing party must

show there is no substantial evidence to support the decision of the municipality. *Olsen,* 247 So.2d at 895. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Duke City,* 101 N.M. at 293, 681 P.2d at 719 (quoting *Rinker v. State Corp. Comm'n,* 84 N.M. 626, 627, 506 P.2d 783, 784 (1973)).

■ As long as the municipality acts within its sphere of discretion we will not inquire into the wisdom of the act even if it "is an economic mistake, a municipal extravagance, and an improper burden upon the taxpayers, as so often urged in contests of this nature." 2 McQuillin, *supra,* § 10.33, at 1093; *see Deaconess,* 403 P.2d at 70. A different policy would place courts in the untenable role of administration rather than adjudication.

■ However, the presumption that the municipality's decision is valid is qualified by the fact that "[t]he courts will always interfere to keep the municipal authorities within the law, and to prevent municipal action that is ultra vires by reason of constitutional provisions or lack of authority, or by reason of clear abuse of discretion or power." 2 McQuillin, *supra,* § 10.37, at 1106; *Planning & Design,* 118 N.M. at 713, 885 P.2d at 634.

## IV. DUE AUTHORIZATION

■ By asking us to consider whether a public works project that has been duly authorized by law can be abated as a public nuisance, the parties implicitly ask us first to determine if the Montaño project is indeed duly authorized. The authorization of a project like the Montaño Bridge involves a complex lattice of laws and regulations dealing with such matters as administrative procedure, eminent domain and rights-of-way, engineering and architectural specifications, urban planning, traffic projections, historical and archaeological preservation, and environmental protection. We define a public works project that is "duly authorized" as one that conforms with *all* the federal, state, and local laws, rules, and regulations pertinent to that particular project. Presumptively, under our standard of review, the decision of the City is

valid. The burden of proving otherwise is on the Village.

■ The Village vaguely alleges that "there is no evidence in the Record that the City Council (the legislative body of the City) had passed an ordinance or otherwise 'duly authorized' this project at the time that the City 'obligated' itself by contracts to build Montaño." The only proof offered by the Village is an affidavit by an assistant city attorney which does not mention this idea. The City on the other hand offers testimonial and documentary evidence showing active authorization for the project over the years.

The Village also points out that, in order to complete the Montaño project, the City must cross property that is under the auspices of the Conservancy District. This will require agreements, licenses, or permits from the Conservancy District and the United States Bureau of Reclamation (Reclamation). The Village offers a letter from Reclamation which states: "Reclamation does not intend to execute any agreements with the City related to the Montaño Bridge Project *until and unless* all legal and environmental compliance issues surrounding the project have been resolved." Letter from Donald Smith, U.S. Dept. of the Interior, Bureau of Reclamation, to William G. Walker, Esq. (Apr. 30, 1992) (emphasis added). The Village claims that Reclamation's permission is dispositive of the whole project. The City describes the permission as almost a ceremonial grant of property interests for the Montaño right-of-way. Under the Village's theory, the nuisance issue is not ripe because the City may never receive the necessary permits from Reclamation. The City counters that one of the issues that must be resolved before Reclamation will execute crossing agreements is whether the project is a public nuisance in fact under New Mexico law; until this issue is resolved, says the City, Reclamation will presumably not execute the crossing agreements. The Village offers no substantial evidence to counter the City's interpretation of the letter from Reclamation. It is our view that the crossing agreements do not relate to the approval of the Montaño project as such. They are analogous to grants of right-of-way

which only need to be obtained by the City prior to beginning construction.

While the Village has made unsubstantiated claims that the project is not duly authorized, previous court decisions have unanimously found otherwise. This general issue has been litigated piecemeal in several state and federal lawsuits. The courts have repeatedly determined that the City has proceeded legally at every stage of the project.

One of the earlier cases concerning this project established that privately owned land within the Village was properly condemned and annexed by the City. *Clark,* slip op. at 6–8.

The New Mexico Court of Appeals evaluated whether the project came under PHSPA which concerns historic and prehistoric sites. The Court found that since PHSPA became effective June 16, 1989—many years after the project was initiated—its provisions would have no retroactive effect on "those portions of the project for which planning was complete and the City had previously received authorization and approval to construct." *City v. Village I,* 111 N.M. at 615, 808 P.2d at 65. More recently the Court of Appeals has reaffirmed this position. *Village v. City II,* 119 N.M. at 173, 889 P.2d at 208 ("The district court correctly interpreted our opinion with regard to Plaintiffs' PHSPA claims.").

In federal court the Village has attacked the City's compliance with NEPA. "The requirements of NEPA apply only when the federal government's involvement in a project is sufficient to constitute 'major federal action.'" *Barnhart,* 906 F.2d at 1480. The Tenth Circuit Court of Appeals concluded that federal funds used to prepare an Environmental Impact Statement were a minuscule portion of the entire project. *Id.* at 1482. Mere eligibility for federal assistance in itself is not sufficient to establish a major federal action requiring the project comply with the requirements of NEPA. *Id.* at 1481.

Because of this lack of federal involvement the Tenth Circuit also found that the Montaño project did not require compliance with Section 470f of the National Historic Preser-

vation Act, 16 U.S.C. §§ 470–470w–5 (1988) (NHPA). *Barnhart,* 906 F.2d at 1484. For the same reason it did not fall under 49 U.S.C. § 303 (1988) of the Department of Transportation Act, which describes a national policy on lands, wildlife and waterfowl refuges, and historic sites. Also inapplicable was 23 U.S.C. § 138 (1988), which mandates preservation of parklands in federal highway projects. *Barnhart,* 906 F.2d at 1484–85. The same reasons mandated that Executive Order 11990, which concerns wetlands protection, did not apply. *See* Executive Order 11990, 3 C.F.R. 121 (Comp.1977), *reprinted in* 42 U.S.C.A. § 4321 (West Supp.1994); *Barnhart,* 906 F.2d at 1485.

The Village challenged the 404 Permit from the Army Corps of Engineers in federal court. The court denied a motion for preliminary injunction, finding "the Corps' decision to grant the [404] permit was [neither] arbitrary and capricious [nor] unreasonable." *Village of Los Ranchos de Albuquerque v. Hatch,* No. CIV 88–1032 JC, slip op, at 35 (D.N.M. May 26, 1989). The court subsequently awarded summary judgment against the Village on this same basis. *Village of Los Ranchos de Albuquerque v. Hatch,* No. CIV 88–1032 JC, slip op. (D.N.M. Nov. 30, 1989). The Tenth Circuit affirmed the award of summary judgment in *Village of Los Ranchos de Albuquerque v. Marsh,* 1991 WL 216536 at *2–3, aff'd on reh'g, 956 F.2d at 973.

Thus, every court has rebuffed the Village's attacks on the City's compliance with the laws governing the Montaño project. There are, however, two statutes that have not been addressed. In April 1991, after remand by the Court of Appeals, the district court found it lacked jurisdiction to grant the Village's motion for leave to file a second amended complaint seeking injunctive relief based upon the City's alleged violations of the Rio Grande Valley State Park Act, NMSA 1978, §§ 16–4–9 to –17 (Repl. Pamp.1987 & Cum.Supp.1994) (Park Act), and the New Mexico Wildlife Conservation Act, NMSA 1978, §§ 17–2–37 to –46 (Repl. Pamp.1988 & Cum.Supp.1993) (Wildlife Act).

In its opinion below, the Court of Appeals stated that more factual development is nec-

essary before the project can be deemed duly authorized. *Village v. City II*, 119 N.M. at 174, 889 P.2d at 209. It remanded the case for consideration of the City's compliance with the Park Act and the Wildlife Act and "any other applicable statute, regulation, or ordinance." *Id.* at 174, 889 P.2d at 209. This is far too broad an instruction. We agree that this case should be remanded to permit the Village to seek relief based upon its allegations related to the Park Act and the Wildlife Act. However, we restrict consideration of any other statutes, regulations, or ordinances to issues that could not have been legitimately raised before December 1, 1993, the date of the Court of Appeals decision. Having viewed the evidence in a light most favorable to the City's claim, we conclude that—apart from the lack of evidence regarding the two statutes specified—the required procedures have been followed and there has been compliance with applicable law. The Village has had at least since 1984 to attack the due authorization of this project. To permit the Village to allege any issues that it could have raised before December 1, 1993, would be to continue the unreasonable piecemeal adjudication that has heretofore characterized this litigation.

The question of due authorization is of special significance to the Village's nuisance claims. Below we will address whether municipal public works project—once it is found to be duly authorized—can be a nuisance in fact.

## V. CAN ONE MUNICIPALITY ESTABLISH ITS OWN PUBLIC WORKS PROJECT WITHIN ANOTHER MUNICIPALITY?

### 1. The general rule

The parties dispute whether the Montaño project is "within the City" and hence under the City's control. The City claims that the narrow corridor through which the project passes is entirely within the municipal boundaries of the City. The Village claims that the proposed Montaño Bridge "bisects" the Village because the corridor is bordered on both sides by the Village. While it is true that the Village is bisected in the technical sense of being cut into two pieces, we note

that one piece is big and the other is little. If the Village were a foot, it would be losing the middle toe. Nevertheless, we must address the extent to which one municipality can establish its public works project within another municipality.

Both the Village and the City have few specific comments about this idea and they have cited only two cases in the entire country on this point: *City of Birmingham v. City of Fairfield*, 375 So.2d 438 (Ala.1979), and *Town of Hokes Bluff v. Butler*, 404 So.2d 623 (Ala.1981).

The basic rule is "that a local government has no extraterritorial powers and cannot, without express authorization from the state, extend its regulations or the force of its laws outside its own boundaries." Osborne M. Reynolds, Jr., *Handbook of Local Government Law* § 54, at 156 (1982); *see, e.g., City of Sedalia ex rel. Ferguson v. Shell Petroleum Corp.*, 81 F.2d 193, 196 (8th Cir. 1936). The key words for the case before us are "express authorization from the state" because statutes often will explicitly—and sometimes implicitly—permit municipalities to exercise powers beyond the city limits. Reynolds, *supra*, § 54, at 156–57; *cf. id.* § 114, at 349 ("[T]oday, must [sic] jurisdictions have statutes specifically allowing at least some municipal utilities to provide their services outside municipal limits."). Thus, "[j]urisdiction over wharves, docks, and other artificial erections sometimes is exercised beyond the municipal limits." 6A McQuillin, *supra*, § 24.57, at 170.

A charter or statute may authorize extraterritorial municipal police regulation of the public water supply, or public grounds in or out of municipal boundaries. Municipal corporations often are permitted to purchase, condemn and otherwise acquire, within and without their limits, all necessary lands for waterworks, gas works, electric lighting plants, hospitals, asylums, cemeteries, etc., and to extend their police jurisdiction over such lands and property. 6A *id.* § 24.57, at 169.

A survey of cases shows that the right of one state political subdivision to establish its public works project within anoth-

er state political subdivision is entirely determined by the state constitution and the state legislature. "The powers conferred upon municipal corporations by statute may be enlarged, diminished, or altogether withdrawn at the will of the Legislature." *Town of Grimesland v. City of Washington*, 234 N.C. 117, 66 S.E.2d 794, 798 (1951). One may impose on the other only as prescribed by law.

New Mexico has an early case which concerns the imposition of a public works project by a municipality outside its boundary, though not upon another municipality. The City of Raton decided to construct its own waterworks system. The controlling statute at the time permitted a municipality to construct waterworks "both within their corporate limits and for a distance of two miles outside of the same." NMSA 1915, § 3564(91). Raton constructed a reservoir at Lake Maloya, more than two miles from the city limits. A pipe line was laid through several tracts of land. Upon being unable to reach an agreement with the owners of the land, Raton filed a petition in condemnation for rights-of-way across the tracts. *City of Raton v. Raton Ice Co.*, 26 N.M. 300, 301, 191 P. 516, 517 (1920). After examining New Mexico eminent domain statutes, the Court concluded that it was "improbable that the Legislature intended to restrict a city to a two-mile limitation for condemnation proceedings in constructing waterworks and in acquiring the source of its water supply." *Id.* at 306, 191 P. at 518. In light of the broad grants of power granted by the eminent domain statutes, "and the nature of the country for which the laws were enacted," a two mile restriction would be unreasonable. *Id.* The legality of Raton's extension of a public works project beyond the city limits was entirely dependent upon statutory authorization by the legislature.

■ In one of the two cases cited by the parties, the City of Fairfield sought to restrain the City of Birmingham from "collecting and diverting surface waters ... into drains, pipes, conduits or artificial channels and precipitating and casting such surface waters in increased quantity, volume, and velocity" onto the streets and property of the citizens of Fairfield. *Birmingham*, 375 So.2d at 439. Birmingham improved its storm drainage system by installing a series of pipes which culminated in a 66–inch pipe that terminated in a ditch near the Birmingham–Fairfield border. A few feet down the ditch was a 36–inch pipe which was the inception of the Fairfield drainage system. Birmingham's flood problems were alleviated but Fairfield was flooded when its 36–inch pipe was unable to carry the increased waters from the Birmingham improvements. *Id.* at 440. Fairfield sought to have the Birmingham system abated as a nuisance. The court found that a statutorily authorized municipal improvement could not be so abated "unless the improvements were negligently constructed or maintained." The evidence showed no negligence by Birmingham. *Id.* at 443. The rule regarding the imposition of a public works project by one municipality on another in *Birmingham* is the same as the rule for a public works project imposed by a municipality on an individual: A government project authorized by law, "constructed and operated exactly as authorized by law and strictly in accordance with good practice, cannot be a nuisance in law, though it may work damage to others." *Id.* at 442 (quoting *Downey v. Jackson*, 259 Ala. 189, 65 So.2d 825, 827 (1953)).

*Village of St. Clair Shores v. Village of Grosse Pointe Woods*, 319 Mich. 372, 29 N.W.2d 860, 861 (1947) (en banc), asked whether "one home-rule village [could] purchase land within the boundaries of another home-rule village and, without the consent and over the objection of the latter village, establish and maintain a municipal park on the purchased land?" Both constitutional and statutory provisions of the State of Michigan authorize municipalities to acquire land outside their corporate limits for public works projects. *Id.* 29 N.W.2d at 862. The court concluded that none of those provisions required "the consent of the municipality wherein the land is located." *Id.*

The general rule applicable to the question before us was stated by the Massachusetts Supreme Court nearly a century ago:

There is nothing in our statutes to prevent a city or town from acquiring by purchase land in another city or town for municipal

purposes, if it is necessary or expedient for the interests of its inhabitants to do so. Indeed, the statutory provisions which give the right of taking land for gravel and clay pits by the right of eminent domain, within the limits of the city or town exercising this right, clearly recognize the right of one municipality to own land in another, by confining its right to take land "not appropriated to public uses or owned by any other city or town."

*City of Somerville v. City of Waltham,* 170 Mass. 160, 48 N.E. 1092, 1092 (1898) (quoting Mass.Pub.St. ch. 49, § 99 (18—)). Jurisprudence of this matter goes back many decades. *See, e.g., City of Allentown v. Wagner,* 214 Pa. 210, 63 A. 697, 697–99 (1906) (stating that statute authorized Allentown to establish hospital for contagious diseases outside the city limits within another township); *In re Borough of Pottstown,* 117 Pa. 538, 12 A. 573, 575 (1888) (statute authorized borough to take part of the territory of adjoining township).

In some of the many cases we surveyed, the municipality failed to comply with state laws. It was thus denied the right it would otherwise possess to impose a public works project outside its boundaries. *See, e.g., City & County of Denver v. Board of County Comm'rs of Grand County,* 782 P.2d 753, 766 (Colo.1989) (en banc) (Denver could not impose its water projects on other counties unless it obtained their permission and complied with their regulations as required by Colorado Land Use Act); *Jones v. City of Detroit,* 277 Mich. 272, 269 N.W. 171, 172–73 (1936) (Wayne County was prevented from erecting four garbage incinerator plants within corporate limits of City of Detroit without permit authorized by a vote of the qualified electors); *City of Amherst v. City of Lorain,* 47 Ohio App.2d 344, 344–46, 354 N.E.2d 714, 715 (Ohio Ct.App.1975) (per curiam) (before one municipality's sewer lines could traverse another municipality, Ohio statute explicitly required the assent of the burdened municipality).

**2. Has the City legally established its public works project within the Village?**

To determine if the City can impose its public works project on the Village, we must determine if the City has acted in accordance with New Mexico law.

The legality of the City's acquisition of the Montaño corridor was settled six years ago by the Court of Appeals in the unpublished opinion *Clark v. City of Albuquerque* to which we denied certiorari, 107 N.M. 587, 761 P.2d 1292 (1988). Part of the corridor was originally privately owned by Ann Simms Clark and her mother Mrs. John Field Simms. It was acquired by Bernalillo County (the county in which both the City and the Village are located) through a condemnation action in August of 1967. In November 1967 Clark executed a warranty deed conveying fee simple title in the condemned property to the County. The remainder of the corridor was owned by the Conservancy District. In November 1982 the Conservancy District consented to annexation of that property by the City. The same day, the County consented to the City annexing the Clark–Simms property. In December the City passed an ordinance annexing both the properties thus placing the entire Montaño Bridge right-of-way project within the City limits. *Clark,* slip op. at 2–3. The purpose of the annexation was "to avoid the need for multi-jurisdictional contracts relative to building the bridge." *Id.* at 2.

Clark and the Village brought suit challenging the annexation of the property. The Court found that because of the original condemnation by the County, Clark was not an owner of the land. At most, she had a mere "use" interest in the property and therefore, had no standing to challenge the annexation. *Id.* at 6–7.

The Village argued that the annexation violated NMSA 1978, Section 3–7–3 (Repl. Pamp.1987), which provides that "No municipality may annex territory within the boundary of another municipality." The Village maintained that the annexation of both properties created a long narrow passage belonging to the City, which cut directly through the southern part of the Village. The Court found an exception to Section 3–7–3 in Section 3–7–4(A) which states:

Territory owned by the government of the United States, its instrumentalities, the state of New Mexico or a political subdivision of New Mexico, may be annexed to a municipality upon the consent of the authorized agent of the government of the United States, its instrumentalities, the state of New Mexico or a political subdivision of New Mexico.

The Court noted that the County and the Conservancy District—and not the Village—owned all the property in the corridor. The annexation from these two "political subdivisions" was thus proper "irrespective of the fact that the situs of the property [was] within another municipality's boundaries." *Clark*, slip op. at 8.

This is the law of the case. The doctrine of the law of the case is "said to express merely the practice of courts to refuse to reconsider what has once been decided." *In re Hermence's Estate*, 235 Iowa 745, 15 N.W.2d 905, 907 (1944); *see also Varney v. Taylor*, 79 N.M. 652, 654, 448 P.2d 164, 166 (1968) ("[W]hat amounts in effect to an adjudication of the issue on a prior appeal, right or wrong, has become the law of the case, and is binding alike upon us and the litigants in all subsequent proceedings in the case."). Under New Mexico statutory law, the corridor in question is within the municipal boundaries of the City.

## VI. IS THIS MUNICIPAL PUBLIC WORKS PROJECT SUBJECT TO REVIEW AS AN ANTICIPATORY NUISANCE IN FACT?

### 1. Nuisance defined and parsed

The Village has alleged the Montaño project violates the New Mexico public nuisance statute, NMSA 1978, Section 30–8–1 (Repl. Pamp.1994):

A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either:

A. injurious to public health, safety, morals or welfare;

or

B. interferes with the exercise and enjoyment of public rights, including the right to use public property.

Whoever commits a public nuisance for which the act or penalty is not otherwise prescribed by law is guilty of a petty misdemeanor.

The Village alleges the Montaño project will be a public nuisance and argues that it should be abated under NMSA 1978, § 30–8–8(B) (Repl.Pamp.1994):

A civil action to abate a public nuisance may be brought, by verified complaint in the name of the state without cost, by any public officer or private citizen, in the district court of the county where the public nuisance exists, against any person, corporation or association of persons who shall create, perform or maintain a public nuisance.

▇ The idea of nuisance is parsed in numerous ways. *See* 58 Am.Jur.2d *Nuisances* § 15 (1989). Private nuisance is distinguished from public nuisance by the interest that is invaded. Restatement (Second) of Torts § 822 cmt. a (1979). There are no New Mexico statutes directly addressing private nuisance. Private nuisance, which has not been raised in this case, is variously described as an invasion of "the private use and enjoyment of land," Restatement, *supra*, §§ 821D, 822, or an invasion "that affects a single individual or a determinate number of persons in the enjoyment of some private right not common to the public," 66 C.J.S. *Nuisances* § 2 (1950).

▇ The common law public nuisance is similar to the New Mexico public nuisance statute, Section 30–8–1. It is an "unreasonable interference with a right common to the general public." Restatement, *supra*, § 821B(1). This public right is one common to—belonging to—"all members of the general public." *Id.* § 821B cmt. g. "It is not, however, necessary that the entire community be affected by a public nuisance, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right or it otherwise affects the interests of the community at large." *Id.* In New Mexico, the public nuisance statute applies to "anything affecting any number of

citizens." Section 30–8–1, flush language. This has been interpreted to mean "a considerable number of people or an entire community or neighborhood." *Padilla v. Lawrence,* 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct. App.), *cert. denied,* 101 N.M. 419, 683 P.2d 1341 (1984); *see also Environmental Improvement Div. v. Bloomfield Irrigation Dist.,* 108 N.M. 691, 696, 778 P.2d 438, 443 (Ct.App.), *cert. denied,* 108 N.M. 681, 777 P.2d 1325 (1989).

▊▊▊ The concept is further divided by New Mexico common law into nuisances per se and nuisances in fact. *Koeber v. Apex–Albuq Phoenix Express,* 72 N.M. 4, 5, 380 P.2d 14, 15–16 (1963) (quoting *Denney v. United States,* 185 F.2d 108, 110 (10th Cir. 1950)). A nuisance per se—also known as nuisance at law—is "an activity, or an act, structure, instrument, or occupation which is a nuisance at all times and under any circumstances, regardless of location or surroundings." 58 Am.Jur.2d, *supra,* § 18; *see* 6A McQuillin, *supra,* § 24.59, at 181. The Court of Appeals has already considered and dismissed the notion that the Montaño project could be a nuisance per se. *City v. Village I,* 111 N.M. at 615, 808 P.2d at 65, *aff'd, Village v. City II,* 119 N.M. at 174, 889 P.2d at 209. A nuisance in fact—also called nuisance per accidens—is usually defined as an activity or structure which is not a nuisance by nature, but which becomes so because of such factors as surroundings, locality, and the manner in which it is conducted or managed. 58 Am. Jur.2d, *supra,* § 17; 66 C.J.S., *supra,* § 3.

## 2. Public works project vs. private construction project as nuisance

It is well established that nuisance is a viable cause of action against a municipal public works project. "A municipal corporation no more than any individual or private corporation can maintain or cause a nuisance, and the same remedies exist, generally speaking, against a nuisance arising from municipal action as in other cases." 6A McQuillin, *supra,* § 24.62, at 188.

This is supported by New Mexico case law such as *State ex rel. New Mexico Water Quality Control Commission v. City of Hobbs,* 86 N.M. 444, 445, 525 P.2d 371, 372 (1974), where Hobbs had maintained a sewage facility so as to create a nuisance. Similarly, in *Barker v. City of Santa Fe,* 47 N.M. 85, 93, 136 P.2d 480, 485 (1943), the City of Santa Fe was found to have maintained a nuisance when a child drowned in sewage tanks surrounded by inadequate fencing. This Court stated, "In the creation of a nuisance a city does not exercise a governmental function, but is doing something forbidden by law." *Id.* at 93, 136 P.2d at 485 (quoting Edward F. White, *Negligence of Municipal Corporations* § 110, at 139 (1920)). We stated that the New Mexico nuisance statutes in effect at the time—NMSA 1929, § 90–402(12), (45) & (54); and NMSA 1941, §§ 14–1830, 14–1835—conferred "upon municipalities the power to abate nuisances, not to create them." *Barker,* 47 N.M. at 93, 136 P.2d at 485. The same is true today. Nothing in the New Mexico law exempts a municipality from the prohibition against creation and maintenance of nuisances.

▊▊▊ However, when a complaint of public nuisance is raised, public works projects are fundamentally different from private construction projects. A public project carries with it the presumption that it is for the public good. Proof that it will be a nuisance must be balanced against its benefit for the public as a whole. *See Richards v. Washington Terminal Co.,* 233 U.S. 546, 551, 34 S.Ct. 654, 656, 58 L.Ed. 1088 (1914) (damage to private property caused by Congressionally authorized train tunnel, "if done without legislative sanction, would form the subject of an action by plaintiff to recover damages as for a private nuisance"); *Anderson v. Souza,* 232 P.2d 274, 284–85 (Cal.Dist.Ct.App.1951) (nuisance claims against private airport would be evaluated differently if it were a public rather than private enterprise), *modified on other grounds,* 38 Cal.2d 825, 243 P.2d 497 (1952) (en banc).

▊▊▊ A public works project, unlike a private construction project, is a product of the exercise of the legislative power. *See Birmingham,* 375 So.2d at 444. The presumption is that the project is publicly scrutinized and balanced against all interests, public and

private, upon which it will have impact. As the history of the Montaño project demonstrates, this process can take several decades and can involve government agencies, the voting public, advocates of private interests, and the courts. At the conclusion of this balancing of interests, a determination is made that, despite any adverse impacts, the project serves the public health, welfare, safety, and rights.

### 3. Anticipatory nuisance

■ The City questions how the Montaño Bridge can be deemed a nuisance since it has yet to be built. The general rule is that anticipatory nuisance is a valid cause of action.

> One distinguishing feature of equitable relief is that it may be granted upon the threat of harm which has not yet occurred. The defendant may be restrained from entering upon an activity where it is highly probable that it will lead to a nuisance, although if the possibility is merely uncertain or contingent he may be left to his remedy of damages until after the nuisance has occurred.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 89, at 640–41 (5th ed. 1984). The general rule is limited by the requirement that the anticipated nuisance must be proven so as to make any argument that it is not a nuisance highly improbable. *See* 6A McQuillin, *supra,* § 24.61, at 186.

This is the rule in New Mexico. Residents alleging public nuisance in *Gonzalez v. Whitaker,* 97 N.M. 710, 711, 643 P.2d 274, 275 (Ct.App.1982), were permitted to bring an action enjoining the construction of a dairy near their property. The Court of Appeals concluded that the residents' suit was not premature because New Mexico case law had established "the propriety of requesting an anticipatory injunction before a nuisance is created, and the correctness of its issuance if the necessary proofs are made." *Id.* at 715, 643 P.2d at 279.

Similarly, *Koeber* involved an action by Albuquerque residents to restrain the construction and operation of a truck terminal as a nuisance in fact. 72 N.M. at 5, 380 P.2d at 15. This Court concluded that the evidence made "it manifest that the construction, operation and maintenance of the truck terminal at the location in question will necessarily become a nuisance, or to say the least, make it highly probable that it will become a nuisance." *Id.* at 6, 380 P.2d at 16.

Both *Gonzalez* and *Koeber* are distinct from the case at hand in that they concern private rather than municipal public enterprises. This distinction between private and public projects can in many situations be dispositive of the anticipatory nuisance issue.

### 4. Can a public works project that is duly authorized be a nuisance?

■ We address here whether this public works project, *if* it is duly authorized, is subject to review as an anticipatory public nuisance in fact. The key statutory language relating to this issue is from the New Mexico public nuisance statute: "A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens *without lawful authority....*" Section 30–8–1 (emphasis added). In a complicated project like the building of a bridge, does that fact that it complies with lawful authority preclude any claim of public nuisance? As this statute relates to public works projects, "lawful authority" is synonymous with "due authorization" as we have defined it above: conformance with all the federal, state, and local laws, rules, and regulations pertinent to that particular project.

We conclude that due authorization is a valid defense to the allegation that a municipal public works project is a nuisance in fact. This defense, however, may or may not prevail depending upon the facts of the situation. As to the facts that determine the success of this defense, the allegation of anticipatory nuisance can be decisive. Therefore we adopt the following rule: If the public works project is in existence and poses a present nuisance, due authorization is a qualified defense; courts may or may not decide that despite the defense the project is still a nuisance. However, if the project has yet to be constructed and is challenged as an anticipatory nuisance in fact, due authorization— as we have defined it in this opinion—is an

absolute defense; courts will summarily conclude that there is no basis for a finding of nuisance.

Thus, where public nuisance has been alleged against an existing public works project, municipalities have been held liable in many jurisdictions, though the projects were properly maintained and legal in every other respect. *See, e.g., Ferguson v. City of Keene,* 111 N.H. 222, 279 A.2d 605, 608 (1971) (municipal owner of airport found liable for damages for the diminution in the plaintiff's property value, though no illegality or improper maintenance was alleged); *Webb v. Town of Rye,* 108 N.H. 147, 230 A.2d 223, 226–28 (1967) (municipal refuse burner subjected residents to significant harm caused by unbearable smoke and stench, though no illegality was alleged and burner was mandated by state law).

On the other hand, several courts have found that compliance with the law is enough to negate a claim of anticipatory nuisance against a municipal public works project. *See, e.g., Warren County v. North Carolina,* 528 F.Supp. 276, 285–86 (E.D.N.C.1981) (When the county sought to prevent a tract of land from being used by the state as a landfill for PCB-contaminated soil, the court concluded that "use by the State of North Carolina of its own property in a manner authorized by valid legislative authority may not be enjoined by the courts as a nuisance."); *Wilcox,* 206 So.2d at 71–73 (proposed bridge across the canal was not nuisance in part because the project was required by the board of county commissioners to give access to planned sewage treatment plant); *Nugent ex rel. Collins v. Vallone,* 91 R.I. 145, 161 A.2d 802, 806 (1960) (proposed construction of wharf for oil tankers is an "[e]xercise of the right to do that which the law authorizes [and] cannot be a public nuisance").

There is authority that contradicts the rule we propose here. For example McQuillin states that "[a]n injunction will lie against a city for an anticipatory nuisance upon a showing that the nuisance is inevitable from the proposed use or operation of the premises." 18 McQuillin, *supra,* § 53.59.40, at 405. Similarly, the South Carolina Court of Appeals suggested—though the facts proved otherwise—that a proposed municipal waste water treatment plant could be enjoined if "nuisance will inevitably or necessarily result." *Roach v. Combined Util. Comm'n of City of Easley,* 290 S.C. 437, 351 S.E.2d 168, 169–70 (Ct.App.1986) (quoting *Strong v. Winn–Dixie Stores, Inc.,* 240 S.C. 244, 125 S.E.2d 628, 633 (1962)). As these ideas are expressed, it would be illogical to conclude otherwise. It would be a poor public policy to permit a municipality to go forward with a project costing millions of dollars that obviously presented a great likelihood of causing a public nuisance. Nonetheless, we believe when "due authorization" is understood in the broad sense that we adopt here, any "inevitable" nuisance will be precluded.

If someone engages in a project that will significantly affect the public, it is presumed that they will take all the necessary measures to avoid creating a nuisance. *See Olsen,* 247 So.2d at 894. If the Montaño project is found to be duly authorized, this will support the presumption that the balancing of interests by the City was thorough and fair. Since the bridge has yet to be built, the only standard by which the impact of the bridge can be measured is by its compliance with the approval process itself. By asking us to consider this project a nuisance, the Village is asking us to reweigh factors that have already undergone extensive administrative, public, and litigious review since the mid–1960s. In effect, the Village is asking us to pretend that our knowledge of bridge building is superior to that of the United States Army Corps of Engineers, municipal engineers, and the many other experts who have debated and collaborated on this project.

The rule we adopt is admittedly based on the presumption that the federal, state, and municipal laws are adequate to properly evaluate all the various interests in this project. There has been no allegation by any of the parties that the administrative process was flawed or that the statutes governing the approval process are incomplete. If there is a problem with this process, it is the duty of the legislature, not the courts, to remedy.

## VII. CONCLUSION

We remand to the district court to permit the Village to seek relief based upon its allegations that the City is not in compliance with the Park Act and the Wildlife Act. The Village is restricted from making any new allegations of noncompliance with any other laws, rules, or regulations that it could have legitimately raised before December 1, 1993. Upon resolution of the issue of due authorization, the Village's nuisance claims will be resolved in accordance with this opinion.

**IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI, J., concur.

RANSOM, J., specially concurring.

RANSOM, Justice (specially concurring).

I concur in the opinion we adopt today but write specially to express a concern with what the parties neither briefed nor argued adequately—if at all—and that, consequently, has not been addressed by this Court. As to whether a public works project that is duly authorized can be a nuisance in fact, the majority acknowledges that "[t]he key statutory language relating to this issue is from the New Mexico Public Nuisance Statute: 'A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens *without lawful authority*.' Section 30–8–1 (emphasis added)." Under the law of this case, the City's annexation of the bridge corridor unquestionably places the corridor within the boundaries of the City and thus under its lawful authority over municipal streets. I question, however, whether we have addressed an elusive but perhaps determinative issue: May the Village or its inhabitants enjoin the building of the bridge as a nuisance in fact on the grounds that the City is *without lawful authority* to make legislative determinations (for the benefit of the City and *its* inhabitants) that have significant injurious impact on the public health, safety, or welfare of its neighbors or that interfere with the exercise and enjoyment of their public rights?

Legislative authority is founded on the consent of the governed. The inhabitants of the Village have not consented to be governed by the City nor do they have the right of political participation in City government. Yet, the City has imposed its legislative will on the Village. Therefore, I posit that conflicting health, safety, and welfare issues impacting adjacent municipalities must be resolved by a common legislature—the state legislature. Today's opinion assumes without analysis that municipal power and authority over the building of bridges, as has been granted by the state legislature, extends to making decisions about the welfare of the public living in the adjacent Village through which the City's bridge corridor passes. Without a specific grant of such power, there may be in relation to a municipality's neighbors no "lawful authority" that would preclude the anticipatory injunction of a nuisance in fact as defined by Section 30–8–1. Our opinion does not broach or resolve this question, which remains to be answered another day.