1998-NMCA-171

968 P.2d 1190

**EMBUDO CANYON NEIGHBORHOOD ASSOCIATION, Petitioner–Appellant,**

v.

**CITY OF ALBUQUERQUE, Respondent–Appellee,**

**and**

**Myers, Oliver & Price/Consensus Planning, Inc., agents for Hinkle Family Fun Center, Inc., Interested Parties.**

No. 18899.

Court of Appeals of New Mexico.

Oct. 20, 1998.

Hessel E. Yntema, III, Oman, Gentry & Yntema, P.A., Albuquerque, for Appellant.

Robert M. White, City Attorney, Randy M. Autio, Ass't City Attorney, Albuquerque, for Appellee.

John A. Myers, Kevin J. McCready, Myers, Oliver & Price, P.C., Albuquerque, for Interested Parties.

*OPINION*

DONNELLY, J.

{1} Embudo Canyon Neighborhood Association (ECNA) appeals from an order of the district court affirming a decision of the Albuquerque City Council (the City Council) approving an application of Myers, Oliver & Price/Consensus Planning, Inc., agents for Hinkle Family Fun Center, Inc. (Hinkle), for a zoning change to permit the operation of an outdoor amusement facility. ECNA raises seven issues on appeal, which we consolidate and discuss as follows: (1) whether evidence in the administrative record supports the action of the City Council, and (2) whether the City's action constituted illegal "spot zoning." We affirm.

*FACTS*

{2} Hinkle filed an application for an amendment to the City of Albuquerque Zoning Code (the Zoning Code) on July 26, 1996, seeking to change the zoning for a 9.55–acre tract of land located at the northwest corner of Tramway Boulevard and Indian School Road. The application sought to change the zoning from C–2 (community commercial) to SU–1 (special use) to permit the operation of a permanent outdoor amusement facility, including the installation and use of a batting cage, go-carts, and bumper boats.

{3} In requesting a zone change to SU–1, Hinkle asserted that the modification was warranted because the outdoor amusement uses contemplated are not permitted under C–2 zoning. Hinkle further argued that: (1) a 1991 Zoning Code amendment changed the zoning classification for the type of outdoor activities in question from C–2 conditional use to "special use"; (2) the City Council had reversed a declaratory ruling by its zoning administrator and ruled that the uses sought to be implemented were not permitted in a C–2 zone; and (3) there had been a substantial increase in traffic and population in the area near that sought to be rezoned.

{4} In urging the zoning amendment, Hinkle further asserted that: (1) it had previously developed portions of the area into a family amusement center; (2) it proposed to utilize currently available technological techniques to minimize any adverse effect the amusement center might have upon surrounding areas; and (3) changed conditions warranted approval of the requested zoning change.

{5} Following a hearing before the Environmental Planning Commission (the EPC), the EPC approved the zone change application. Thereafter, ECNA appealed the decision to the City Council. The City Council affirmed, and ECNA applied for a writ of certiorari to the district court pursuant to NMSA 1978, § 3–21–9 (1965). On September 3, 1997, the district court entered an order finding that there was substantial evidence to support the decision of the City Council, the decision of the City Council was in conformity with law, and the zone change did not constitute improper spot zoning. ECNA filed a timely appeal from the order.

*DISCUSSION*

{6} ECNA argues that the district court erred in upholding the decision of the City

Council to grant the zone change to SU-1, and that the action of the City Council was contrary to Resolution 270–1980, Albuquerque, N.M.Code of Ordinances, § 1–1–2 (1994), and resulted in illegal "spot zoning" of the property in question.

{7} When reviewing challenges to the validity of a municipality's zoning actions, we apply an administrative standard of review and examine all of the evidence presented at the hearing below, both favorable and unfavorable, bearing on the city's decision to determine if there is substantial evidence to support the result on the record as a whole. *See Huning Castle Neighborhood Ass'n v. City of Albuquerque,* 1998–NMCA–123, ¶ 8, 125 N.M. 631, 964 P.2d 192 ; *Siesta Hills Neighborhood Ass'n v. City of Albuquerque,* 1998–NMCA–028, ¶ 6, 124 N.M. 670, 954 P.2d 102; *West Old Town Neighborhood Ass'n v. City of Albuquerque,* 1996–NMCA–107, ¶ 11, 122 N.M. 495, 927 P.2d 529. Applying this administrative standard of review, we utilize the same standard as the district court, and "the decision of the zoning body is disturbed only if the court is not satisfied that the action was authorized by law or if the zoning authority's decision is not supported by substantial evidence." *Huning Castle Neighborhood Ass'n,* 1998–NMCA–123, ¶ 8, 125 N.M. 631, 964 P.2d 192.

{8} Decisions of a municipality are presumably valid and the burden of proving otherwise rests upon a party seeking to void such decision. *See State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque,* 119 N.M. 150, 157, 889 P.2d 185, 192 (1994). The party seeking to overturn such decision must establish that there is no substantial evidence to support the municipality's decision. *See id.* at 157–58, 889 P.2d at 192–93. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 158, 889 P.2d at 193 (citations and quotation marks omitted).

{9} Prior to the application for a zone change from C–2 to SU–1, the land in question was zoned for general, community-wide, commercial activities which could include, for example, a McDonald's, Wal–Mart, Home Base, or a full-service liquor establishment.

*See* Albuquerque, N.M.Code of Ordinances, § 14–16–2–17 (1994). The City Council previously approved, and Hinkle already constructed on the site, the 1800–seat High Ridge Theater complex.

{10} A permanent outdoor amusement facility is not a permissive use under C–2. In order to operate such an enterprise, the land must be zoned SU–1. The 1991 Zoning Code amendment provided, in pertinent part: "[N]o outdoor storage or activity specified as a principal special use in § 14–16–2–22(B) of the Zoning Code, the SU–1 zone, may be a conditional use considered under this division (B)" of the C–2 zone. Section 14–16–2–17(B)(13)(a). Thus after 1991, the use Hinkle applied for was excluded as a C–2 conditional use and specifically included as a SU–1 special use. The SU–1 zone ordinance states: "This zone provides suitable sites for uses which are special because of infrequent occurrence, effect on surrounding property, safety, hazard, or other reasons, and in which the appropriateness of the use to a specific location is partly or entirely dependent on the character of the site design." Albuquerque, N.M.Code of Ordinances, § 14–16–2–22 (1994). The permitted SU–1 special uses include a permanent amusement facility. *See* § 14–16–2–22(B)(4).

{11} The parties agree that Resolution 270–1980, established by the City Council, articulates the policies and requirements for determining whether a zone change is proper. Resolution 270–1980 includes the following considerations upon which the City Council must base a rezoning decision:

(A) A proposed zone change must be found to be consistent with the health, safety, morals, and general welfare of the city.

(B) Stability of land use and zoning is desirable; therefore the applicant must provide a sound justification for the change. The burden is on the applicant to show why the change should be made, not on the city to show why the change should not be made.

(C) A proposed change shall not be in significant conflict with adopted elements of the Comprehensive Plan or other city

master plans and amendments there, to, [sic] including privately developed area plans which have been adopted by the city.

(D) The applicant must demonstrate that the existing zoning is inappropriate because:

(1) There was an error when the existing zone map pattern was created; or

(2) Changed neighborhood or community conditions justify the change; or

(3) A different use category is more advantageous to the community, as articulated in the Comprehensive Plan or other city master plan, even though (D)(1) or (D)(2) above do not apply.

(E) A change of zone shall not be approved where some of the permissive uses in the zone would be harmful to adjacent property, the neighborhood, or the community.

Section 1–1–2; *see also West Old Town Neighborhood Ass'n,* 1996–NMCA–107, ¶ 18, 122 N.M. 495, 927 P.2d 529.

{12} ECNA argues that the evidence in the administrative record does not support the City Council's approval of Hinkle's zone change. We disagree. A party challenging the sufficiency of the evidence to support findings adopted by an administrative body must set forth the substance of all the evidence bearing on the issue in question, and must demonstrate why, on balance, the evidence does not support the finding or findings made. *See Martinez v. Southwest Landfills, Inc.,* 115 N.M. 181, 184, 848 P.2d 1108, 1111 (Ct.App.1993). ECNA fails to detail evidence in the record that supports the City Council's action.

{13} The City Council made the following findings of fact in issuing its decision to rezone Hinkle's land:

1. There was sufficient evidence to support a finding that the requirements for a zone change under Resolution 270–1980 were met.

2. The proposed uses are consistent with Comprehensive Plan policies.

3. There was sufficient evidence to support the EPC's finding that adverse impact from the proposed uses can be mitigated to prevent a harmful effect on surrounding residences.

4. The revision of the Zoning Code that allowed permanent amusement facilities only in the SU–1 zone necessitated a zone change request for the proposed use and created a changed condition.

. . .

6. "More advantageous to the community" is a legal basis for granting a zone change under the facts at issue.

7. The EPC's decisions, including its approval of operations after 10:00 p.m., were not arbitrary or capricious; however, after 10:00 p.m. uses are allowed as [ ]long as the noise ordinance provisions are complied with.

8. The EPC properly left the determination of whether noise from the proposed use will have a detrimental impact on nearby residential activities to the City's Environmental Health Department.

9. The record justified placing a special use in the proposed location.

. . .

12. The EPC properly applied adopted city plans, policies, and ordinances in arriving at its decision.

. . .

15. The operation of engines using fossil fuels shall cease operation during no-burn nights or nights where "driving is discouraged or limited to essential use only".

{14} Review of the administrative record indicates that a number of witnesses testified in support of the proposed zone change and presented evidence that the change would provide a needed recreational outlet for children. Support for the existing and proposed facilities was voiced by city residents and community organizations, including D.A.R.E., Y.M.C.A., Boy Scouts of America, the Big Brothers/Big Sisters program, youth sport leagues, and church groups. Over 2500 city residents signed petitions or statements in support of the proposed facilities. There was also evidence that the restrictions imposed by the EPC in approving the Zoning Code amendment and Hinkle's site plan would al-

leviate noise concerns or any significant detrimental impact upon nearby residential areas. Additionally, evidence was presented that operation of the proposed facility would provide enhanced employment to a number of employees. Thus, evidence exists in the record from which the City Council could reasonably determine that the zone change is advantageous to the community, that it will provide needed recreational and employment opportunities, and that managed entertainment facilities are an important asset and amenity to the community.

{15} ECNA, however, asserts that, in addition to its challenge concerning the sufficiency of the evidence, the action of the City Council upholding Hinkle's application for a zone change to SU–1 constitutes impermissible spot zoning. In *Watson v. Town Council of Town of Bernalillo*, 111 N.M. 374, 378, 805 P.2d 641, 645 (Ct.App.1991), this Court, quoting from 2 Edward H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 28.01 at 28–1 to –2 (Rev.1990), observed:

> "The term 'spot zoning' refers to the rezoning of a small parcel of land to permit a use [that] fails to comply with a comprehensive plan or is inconsistent with the surrounding area, grants a discriminatory benefit to the parcel owner, and/or harms neighboring properties or the community welfare."

{16} In the instant case, Hinkle in effect applied for a special use permit exception from the city's general zoning plan. As a general rule, a special use exemption does not involve rezoning; rather it is a conditional use permitted under an existing zone. *See, e.g.,* 83 Am.Jur.2d, *Zoning and Planning* § 962 at 804–05 (1992) ("The grant of a special use permit ... is not an amendment of the general zoning ordinance.... Since a special [use] permit is not an amendment, it cannot constitute spot zoning." (footnotes omitted)); *see also* 5 Norman Williams, Jr. & John M. Taylor, *Williams American Land Planning Law* § 148 at 187 (1985 rev.) (noting that municipal zoning ordinances typically provide for the allowance of special use permits authorizing specific land uses, subject to detailed conditions, which otherwise vary from the applicable zoning restrictions).

{17} Nonetheless, the Albuquerque City Council has by ordinance limited the construction of any "[a]musement facility of a permanent character" to land zoned SU–1. *See* § 14–16–2–22(B)(4). Accordingly, as the proposed site of Hinkle's project is currently zoned C–2, it must apply for a zoning change, and not a special use permit, to proceed with its plan.

{18} Thus, Hinkle was required to apply for a zoning change, not merely a special use permit. Upon its evaluation of the evidence presented in support of and in opposition to the change, the City Council granted Hinkle's request. In responding to ECNA's challenges on appeal, the City argues that the rezoning approved here is not, as ECNA argues, an example of spot zoning as contemplated by the Court in *Watson* or Resolution 270–1980. We agree.

{19} Whether rezoning of a parcel of land constitutes impermissible spot zoning is fact specific and must be determined from the facts and circumstances of each case. *See Watson,* 111 N.M. at 378, 805 P.2d at 645. The City Council has adopted its own criteria for evaluating zone change requests. Resolution 270–1980, § 1–1–2(I), provides, in relevant part:

> (I) A zone change request which would give a zone different from surrounding zoning to one small area, especially when only one premise is involved, is generally called a "spot zone." Such a change of zone may be approved only when:
>
> (1) The change will clearly facilitate realization of the Comprehensive Plan and any applicable adopted sector development plan or area development plan, or
>
> (2) The area of the proposed zone change is different from surrounding land because it could function as a transition between adjacent zones; because the site is not suitable for the uses allowed in any adjacent zone due to topography, traffic, or special adverse land uses nearby; or because the nature of structures already on the premises makes the site unsuitable for the uses allowed in any adjacent zone.

{20} Under the test articulated in *Watson*, "spot zoning may occur under two circumstances: (1) if the use fails to comply with the comprehensive plan; or (2) if the use is inconsistent with the surrounding area, grants a discriminatory benefit to the land owner, and/or harms neighboring properties or the community welfare." *Watson*, 111 N.M. at 378, 805 P.2d at 645. Viewed in light of the first part of either the *Watson* test or Resolution 270–1980, the zone change complies with the Comprehensive Plan. We see nothing in the City's Comprehensive Plan that indicates that the City Council, in making the 1991 amendment to the Zoning Code, intended to banish or restrict permanent amusement facilities to the City's outskirts; instead, it is evident that such facilities may be integrated into certain areas of the City if the applicant makes a satisfactory showing that the strict criteria detailed in the ordinance have been met.

{21} Furthermore, the second part of both tests allows the creation of a SU–1 zone within a C–2 zone where it is shown that the restrictions imposed by the city will ameliorate any harm to the surrounding property and the authorized use is beneficial to the community as a whole. Applying the above criteria to the record before us, we conclude that the City Council and the district court did not err in determining that the rezoning did not constitute spot zoning. The City Council found that the nature of the entertainment uses already in operation on the site made it suitable for the expansion of family-oriented recreational activities. Additionally, there is evidence that any ambient noise from the amusement park operations would not adversely affect nearby residential zones and the noise level would be negligible compared with the surrounding road noise at the intersection of Tramway Boulevard and Indian School Road; that any resulting noise would be within the limits of the City's noise restrictions; and that any adverse effects of the noise which might result from the zoning change were addressed and mitigated by the Zoning Code amendment. Significantly, the City Council also expressly determined that change in use would be advantageous to the community's youth and families by providing a needed recreational facility.

{22} Thus, the district court could reasonably determine, based on the record herein, that the alternative tests of either *Watson* or Resolution 270–1980, § 1–1–2(I) were satisfied. Under the Resolution, SU-1 uses are part of the Comprehensive Plan and the SU–1 zone is compatible with the surrounding C–2 zoned areas and the subject property functions as a transition between Tramway Boulevard and Skyline Shopping Center on one side and less intense residential uses on the other. In sum, we conclude that the rezoning of Hinkle's land does not constitute impermissible spot zoning and that the action of the City Council is supported by substantial evidence.

*CONCLUSION*

{23} For the reasons discussed herein, we affirm.

{24} IT IS SO ORDERED.

PICKARD and ARMIJO, JJ., concur.