1999-NMCA-043

975 P.2d 366

**Charles HART, Petitioner–Appellee,**

v.

**CITY OF ALBUQUERQUE, a New Mexico Municipal Corporation, Respondent–Appellant.**

· **No. 19026.**

Court of Appeals of New Mexico.

Jan. 21, 1999.

Susan K. Barger, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for Appellee.

Robert M. White, City Attorney, David Suffling, Ass't City Attorney, Albuquerque, for Appellant.

## OPINION

WECHSLER, Judge.

{1} The City of Albuquerque (City) appeals the decision of the district court ordering the City Council to grant Mark Yancey's [1] requested zoning change from residential to commercial and finding that the City Council's decision is not supported by substantial evidence. The City contends that the district court exceeded its scope of review for a zoning appeal and that substantial evidence supports the City Council's decision. We reverse.

### Facts

{2}. This case involves three vacant lots located on the northwest corner of Candelaria Road NE and Arno Street NE in the City of Albuquerque. The City annexed the lots in 1967 and zoned them single family residential (R–1). Some of the land surrounding the lots is outside City limits and zoned by Bernalillo County, and some of the land is within City limits. The general area contains mixed-use zoning—manufacturing, commercial, and residential. The lot immediately to the north is within City limits. It is zoned residential and contains a single-family home. On both sides of Arno Street farther to the north is land outside City limits and zoned

1. During pendency of this appeal, Yancey conveyed the lots to Charles Hart, who is substituted as Appellee.

commercial, but which contains some single-family residences. The land directly to the east is also outside City limits and is zoned for manufacturing. Directly to the south, within city limits and across Candelaria Road, lies the Stronghurst Addition, which consists entirely of single-family residential homes.

{3} In October 1995, Yancey filed an application for zone map amendment with the Albuquerque City Planning Department requesting that the zoning of the lots be changed from R–1 to general commercial (C–2). The Environmental Planning Commission (EPC) held a public hearing on December 21, 1995 at which Bessie Romero, owner of the single-family residence on the R–1 lot immediately to the north of the lots, spoke in opposition of the proposed change. Walter Gelb, assistant planner with the City Planning Department, prepared a staff report for the hearing which recommended against the proposed change because it was contrary to City Resolution 270–1980. Resolution 270–1980 allows for zoning changes only if the applicant demonstrates an error in the zone map or changed conditions, or that the proposed zone is more advantageous to the community. See Resolution 270–1980, Albuquerque, N.M.Code of Ordinances, § 1–1–2 (1994). The EPC essentially denied the proposed change, voting to "indefinitely defer [the requested] zone map amendment from R–1 to C–2 in order to allow the applicant the opportunity to pursue uses which would be more compatible with the adjacent uses."

{4} On March 21, 1996 the EPC held a second hearing on the proposed zone map amendment. The EPC voted to deny the proposed zone map amendment and made findings that the proposed change did not meet the requirements of Resolution 270–1980, had "no substantial community benefit[,] could negatively affect the abutting residential neighborhood, [and] would create a spot zone of the remaining R–1 [lot]."

{5} Yancey appealed this decision to the City Council's Land Use, Planning and Zoning Committee (LUPZC) which held a public hearing on May 29, 1996. The LUPZC heard testimony from Yancey's counsel supporting the change. Gelb spoke on behalf of the City Planning Department, stating that the proposed zone map amendment did not meet the requirements of Resolution 270–1980. Romero and her husband spoke against the proposed change. The EPC representative, Jane Brown, explained that the EPC found that the proposed change failed to comply with the requirements of Resolution 270–1980. The LUPZC upheld the EPC's decision and voted that the appeal should not be heard by the full City Council. The LUPZC adopted findings that the proposed change did not meet the requirements of Resolution 270–1980 and that some of the uses of the proposed change "would be harmful to adjacent R–1 property." On June 3, 1996, the City Council upheld the denial of the zone map amendment, adopting the recommendation of the LUPZC.

{6} Yancey appealed the denial of the zone map amendment to the district court. The district court determined that the City Council's decision to deny the zoning change was not supported by substantial evidence and was contrary to law. The district court also made findings that Yancey had met his burden and presented sufficient evidence to support the zone map amendment. Upon its review, the district court reversed and remanded the City Council's denial of Yancey's requested zone change.

{7} The LUPZC heard the matter again on March 12, 1997 and voted to hear new evidence to determine whether the zoning change should be granted. Yancey then returned to the district court and obtained a writ of mandamus. This writ precluded the City Council from taking additional evidence or testimony and from conducting a de novo review. The writ also stated that Yancey had presented substantial evidence to support a zoning change and ordered the City Council to determine a "new zoning category" for the lots based "on the evidence contained in the original record."

{8} On May 5, 1997, the full City Council heard the matter and voted to deny Yancey's requested zone map amendment. The City Council found that the proposed "zone change is not supported" by Resolution 270–1980, that some permissive uses of C–2 zoning would be harmful to adjacent property,

and that it would consider a change other than C–2. Yancey again appealed the City Council's decision to the district court. On October 22, 1997, the district court found that Yancey "met his burden, as a matter of law, under City of Albuquerque Resolution 270–1980 by presenting sufficient evidence to support the requested zone map amendment." The court also found that the City Council's denial was not supported by substantial evidence and was contrary to law. It ordered: "The decision of the Albuquerque City Council denying [Yancey's] requested zone change be *reversed* [and][t]he City of Albuquerque is hereby directed to grant [Yancey's] requested zone change from R–1 to C–2 immediately, without additional hearing or evidence." The City appeals the district court's October 22, 1997 order.

## The Scope of the District Court's Review

{9}  A district court conducts a whole-record review to determine if the municipality acted fraudulently, arbitrarily, or capriciously by determining if the municipality's decision was supported by substantial evidence, was outside the scope of the agency's authority, or was contrary to law. *See* NMSA 1978, § 3–21–9 (1965);[2] Rule 1–074(Q) NMRA 1999. The court examines all evidence, both favorable and unfavorable, to determine if the municipality's decision is supported by substantial evidence. *See Huning Castle Neighborhood Ass'n v. City of Albuquerque*, 1998–NMCA–123, ¶ 8, 125 N.M. 631, 964 P.2d 192. If a district court concludes that the municipality acted fraudulently, arbitrarily, or capriciously, it is required to reverse the municipality's decision. *See id.* The district court does not determine if the opposite result is supported by substantial evidence because it may not substitute its judgment for that of the administrative body. *See Siesta Hills Neighborhood Ass'n v. City of Albuquerque*, 1998–NMCA–028, ¶ 6, 124 N.M. 670, 954 P.2d 102.

■ {10}  In this case the district court determined not only that the City of Albu-

querque's decision was not supported by substantial evidence, but also that substantial evidence supported Yancey's request for a zone map amendment. This latter finding apparently led the court to issue a writ of mandamus against the City Council, and in its October 22, 1997 decision, order the City to change the zoning of the lots from R–1 to C–2. This finding exceeded the district court's scope of authority because the court substituted its judgment for that of the City Council. *See id.* A "court cannot prescribe what zoning shall be applied to a particular property." 8A Eugene McQuillin, *The Law of Municipal Corporations* § 25.278, at 426 (Julie Rozwadowski & James Solheim eds., rev.3d ed.1994); *see Renick v. City of Md. Heights*, 767 S.W.2d 339, 342 (Mo.Ct.App. 1989).

{11}  On appeal, the City argues that the district court improperly relied on Section 3–21–9(D) to order the change in zoning. Section 3–21–9(D) states:

If, at the hearing [to review the municipality's decision], it appears to the court that testimony is necessary for the proper disposition of the matter, it may take evidence or appoint a referee to take such evidence as it may direct and report the same to the court with his findings of fact and conclusions of law, which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse, affirm or modify the decision brought up for review.

{12}  This section appears to allow greater judicial activity in zoning cases than in other administrative agency decisions. However, in *Coe v. City of Albuquerque*, 76 N.M. 771, 774, 418 P.2d 545, 547 (1966), our Supreme Court expressly determined the zoning statute to be unconstitutional to the extent that it purports to allow a district court to zone land. The *Coe* case involved a request to rezone a parcel from residential to commercial. *See id.* at 772, 418 P.2d at 546. The city commission denied the request and the petitioners filed a writ of certiorari to the

**2.**  The legislature revised Section 3–21–9 effective September 1, 1998. Prior to the revision an aggrieved party would file a writ of certiorari to the district court, which had discretion over

whether to accept or not. As of September 1, 1998 an aggrieved party now files a notice of appeal with the district court, and a writ of certiorari to this Court.

district court. *See id.* at 773, 418 P.2d at 547. The district court rezoned the property from residential to commercial and the city commission appealed to the Supreme Court. *See id.* The Court interpreted the subsection not as limiting evidence to be received, but as effectively authorizing a trial de novo, thereby violating the constitutional doctrine of separate powers because it allowed the court to substitute its judgment for that of the administrative body. *See id.* at 773–74, 418 P.2d at 547. According to our Supreme Court, "[t]o the extent that § 14–28–16, N.M.S.A.1953 [now Section 3–21–9], purports to allow the district court to zone land, it is void as an unconstitutional delegation of power to the judiciary, contravening art. III, § 1 of the New Mexico Constitution. The trial court had no authority to rezone the property to C–1." *Id.* at 774, 418 P.2d at 547.

{13} Yancey contends that *Coe* does not apply to the present case because the rationale in *Coe* is based upon the fact that a zoning decision is legislative while more recent New Mexico cases have held that zoning decisions which apply to particular plots of land are quasi-judicial. *See West Old Town Neighborhood Ass'n v. City of Albuquerque,* 1996–NMCA–107, ¶11, 122 N.M. 495, 927 P.2d 529. Zoning decisions can be either legislative or quasi-judicial depending upon the impact of the zoning change. *See Miles v. Board of County Comm'rs,* 1998–NMCA–118, ¶11, 125 N.M. 608, 964 P.2d 169; *West Old Town Neighborhood Ass'n,* 1996–NMCA–107, ¶11, 122 N.M. 495, 927 P.2d 529; *Downtown Neighborhoods Ass'n v. City of Albuquerque,* 109 N.M. 186, 189, 783 P.2d 962, 965 (Ct.App.1989). But regardless of whether the zoning decision is deemed legislative or quasi-judicial, the administrative standard of review applies. *See West Old Town Neighborhood Ass'n,* 1996–NMCA–107, ¶11, 122 N.M. 495, 927 P.2d 529; *Downtown Neighborhoods Ass'n,* 109 N.M. at 189, 783 P.2d at 965. The district court is not authorized to overturn a rejection of a petition for a zoning change and then order the City to rezone. The district court exceeded its authority in this instance.

{14} Yancey further claims that this Court's decision in *Clayton v. Farmington*

*City Council,* 120 N.M. 448, 455, 902 P.2d 1051, 1058 (Ct.App.1995), compels us to review the holding in *Coe* to allow the district court to exercise its power to order approval of a zoning request. In *Clayton,* this Court examined NMSA 1978, § 3–19–8 (1965) (appeal from a planning and platting decision) in determining the standard of review the appellate court should conduct when the statute permits de novo review in the district court. *See Clayton,* 120 N.M. at 453–55, 902 P.2d at 1056–58. Neither party raised the constitutionality of the district court's authority to conduct de novo review in a zoning case. *See id.* at 455, 902 P.2d at 1058. After conducting a de novo review, this Court concluded that the district court would have power and discretion to approve a request, but it did not "determine precisely the extent of that discretion." The Court found it unnecessary to determine the extent of the discretion because the district court upheld the administrative agency's decision. *See id.* We emphasize that unlike the situation in *Clayton,* the language ruled unconstitutional in *Coe* did not explicitly provide for de novo review.

{15} The procedure for district court review of zoning decisions under both Section 3–21–9 and Section 3–19–8 has been changed effective September 1, 1998. Both sections now follow NMSA 1978, § 39–3–1.1 (1998) for obtaining court review of an agency's decision. *See* NMSA 1978, § 3–21–9 (1998); NMSA 1978, § 3–19–8 (1998). Neither the wording ruled unconstitutional in *Coe* nor the wording interpreted in *Clayton* remains in force. In light of the change in appellate review and the fact that Section 3–21–9(D) did not explicitly provide for de novo review, we decline to examine extending the rationale of *Clayton* to Section 3–21–9(D).

*Writ of Mandamus*

{16} The City also argues on appeal that the district court acted improperly in issuing the writ of mandamus. Before addressing the City's challenge directly, we first comment on, without deciding, the issue of timeliness of the City's appeal on the writ of mandamus. A final judgment on a writ of mandamus is reviewable on appeal. *See* NMSA 1978, § 44–2–14 (1899); · *see also*

*Khalsa v. Levinson,* 1998–NMCA–110, ¶¶ 12–13, 125 N.M. 680, 964 P.2d 844 (final order is appealable). The City did not appeal immediately following issuance of the writ. Instead the City waited until resolution of Yancey's second appeal to the district court. Each decision by the district court, the first decision reversing the City Council's decision, the issuance of the writ of mandamus, and the second decision ordering the zoning change, was an appealable event. *Cf. State ex rel. Hyde Park Co. v. Planning Comm'n,* 1998–NMCA–146, ¶ 6, 125 N.M. 832, 965 P.2d 951 (commenting that an appeal from a writ of mandamus may be disfavored as contrary to the policy against piecemeal appeals, if writ is linked to unresolved pending issues). Regardless, we address the district court's issuance of the writ to provide direction to district courts.

{17} Mandamus is issued only when "the petitioner ... establish[es] a clear legal right to the performance of the duty sought to be enforced.... [I]n order for mandamus to issue, the act to be compelled must be ministerial, constituting a nondiscretionary duty which the respondent is required to perform." *In re Grand Jury Sandoval County,* 106 N.M. 764, 766, 750 P.2d 464, 466 (Ct.App. 1988). "A ministerial duty required of a public official constitutes 'an act or thing which he is required to perform by direction of law upon a given state of facts being shown to exist, regardless of his own opinion as to the propriety or impropriety of doing the act in the particular case.'" *Id.* at 767, 750 P.2d at 467 (quoting *State ex rel. Four Corners Exploration Co. v. Walker,* 60 N.M. 459, 463, 292 P.2d 329, 332 (1956)); *cf. State ex rel. Edwards v. City of Clovis,* 94 N.M. 136, 139, 607 P.2d 1154, 1157 (1980) (upholding issuance of writ of mandamus ordering city council to enforce existing zoning ordinance).

{18} In this case, the issuance of the writ of mandamus can be traced back to the district court's exceeding its scope of review when it determined that Yancey's requested zone map amendment was supported by substantial evidence. Once the district court reversed the City's decision stating that substantial evidence did not support the decision, the City Council had an outstanding application for a zone map amendment which required action. The district court could not issue a writ of mandamus to interfere with the City Council's legitimate exercise of its authority to act on the application. The City Council's actions were not ministerial at that point, and thus mandamus did not lie. After reversal by the district court, the City Council would necessarily follow its procedures for zoning requests, or alternately, appeal the district court's decision for review by this Court.

*Whether Substantial Evidence Supports the City Council's Decision*

{19} This Court conducts the same review under the same standards as the district court. Accordingly, as discussed above, "the decision of the zoning body is disturbed only ... if the zoning authority's decision is not supported by substantial evidence ." *Huning Castle Neighborhood Ass'n,* 1998–NMCA–123, ¶ 8, 125 N.M. 631, 964 P.2d 192. Therefore, we must determine if the City Council's decision to disapprove the zone map amendment is supported by substantial evidence. "Decisions of a municipality are presumably valid and the burden of proving otherwise rests upon a party seeking to void such decision." *Embudo Canyon Neighborhood Ass'n v. City of Albuquerque,* 1998–NMCA–171, ¶ 8, 126 N.M. 327, 968 P.2d 1190. "The party seeking to overturn such decision must establish that there is no substantial evidence to support the municipality's decision." *Id.*

{20} Resolution 270–1980 articulates the policies for approving a zone map change. It states in part:

The following policies for deciding zone map change applications pursuant to the Comprehensive City Zoning Code are hereby adopted:

A. A proposed zone change must be found to be consistent with the health, safety, morals, and general welfare of the City.

B. Stability of land use and zoning is desirable; therefore, the applicant must provide a sound justification for the change. The burden is on the applicant to show why the change

should be made, not on the City to show why the change should not be made.

C. A proposed change shall not be in significant conflict with adopted elements of the Comprehensive Plan or other City master plans and amendments thereto including privately developed area plans which have been adopted by the City.

D. The applicant must demonstrate that the existing zoning is inappropriate because;

    (1) there was an error when the existing zone map pattern was created, or

    (2) changed neighborhood or community conditions justify the change, or

    (3) a different use category is more advantageous to the community, as articulated in the Comprehensive Plan or other City master plan, even though (1) or (2) above do not apply.

E. A change of zone shall not be approved where some of the permissive uses in the zone would be harmful to adjacent property, the neighborhood or the community.

Resolution 270–1980, § 1–1–2.

{21} After the district court's first order, the City Council conducted a full hearing on May 5, 1997. The City Council had before it the history of the zone map amendment and the records of the previous hearings of the EPC, LUPZC, and City Council. It concluded that the requested change was not supported by Resolution 270–1980 because some of the permissive uses in C–2 zoning "would be harmful to the adjacent property" contrary to Section E. Yancey contends that there was not substantial evidence to support the City Council's denial of the zone map amendment because the only evidence presented in opposition to his application was Romero's testimony that she wanted the property to retain its R–1 designation.

■ {22} Yancey examines the evidence presented too narrowly. While Romero and her husband apparently were the only neighbors who attended the LUPZC and City Council hearings and voiced concern about noise, lights, and traffic, the residents of the Stronghurst Addition also expressed concerns about a change in zoning for the lots. Yancey organized a meeting, held on February 20, 1996 and conducted by a facilitator, at which area residents, recognizing that a zone change might occur and be more favorable than the existing R–1 zoning, nonetheless expressed their interest that any businesses located on the lots be quiet and low traffic. In his October 26, 1995 application for zone map amendment, Yancey originally proposed that the lots be used for an automobile dealership and commercial building. At the February 20, 1996 facilitated meeting, Yancey proposed that a vinyl sign business be housed on the lots. The owner of the vinyl sign business attended the meeting and explained her business and the low impact it would have on the neighborhood. At its March 7, 1997 annual meeting, the Stronghurst Improvement Association "voted to accept C–2 zoning as an alternative to the existing R–1 zone." However, "[t]his acceptance was based on presentation of proposal for the location of a vinyl sign business."

{23} At the May 29, 1996 LUPZC meeting, the EPC representative explained that the EPC recommended against the proposed change because "the change offered no community benefit[,] could negatively affect the abutting residential neighborhood, [and] did not meet the requirements of Resolution 270–1980." The EPC was also concerned that while Yancey expected a "clean" business to use the lots, once the lots were zoned C–2, businesses that were "not so clean" also would be permitted at the lots. The City Planning Department representative agreed that the application did not meet the requirements of Resolution 270–1980.

{24} In denying the zone map amendment, the City Council appears to have been addressing the concerns of the residents that some permissible uses of C–2 zoning would be too intense for the lots. The City Council recognized that if it approved C–2 zoning for the lots, there would be minimal restrictions on the types of business that could locate there. *See Huning Castle Neighborhood Ass'n*, 1998–NMCA–123, ¶ 14, 125 N.M. 631, 964 P.2d 192 (sustaining decisions supported by substantial evidence or reasonable infer-

ences therefrom). It could no longer guarantee that only a quiet, low-traffic business that would not be harmful to adjacent properties would locate on the lots. Councilor Griego specifically noted that C–2 zoning allows for "radio or television stations, large signs, vehicle sales and repairs, a pawn shop and a dry cleaner, to name just a few uses that no one would want to live next to." He further elaborated that the zoning regulations are "intended to create orderly and harmonious development to promote the health and safety of the citizens [and] [p]utting in a C–2 zone next to an R–1 zone does the opposite of that." Recognizing that R–1 may no longer be the proper zoning for the lots, the City Council also adopted a finding that it would consider a zone change other than C–2 that would not be harmful to adjacent property, upon a showing of "sufficient, competent, evidence to support the change." We find substantial evidence that the City Council was concerned about potential harm to neighboring residential areas in accordance with Section E of Resolution 270–1980 to support the City Council's denial of the zone map amendment. *See Embudo Canyon Neighborhood Ass'n*, 1998–NMCA–171, ¶ 8, 126 N.M. 327, 968 P.2d 1190.

*Conclusion*

{25} We hold that the district court exceeded its scope of review in ordering the zoning change. We further hold that the court improperly issued the writ of mandamus. Finally, we also hold that substantial evidence supports the City Council's denial of the zone map amendment. We therefore reverse the decision of the district court.

{26} **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.