2000-NMCA-026

997 P.2d 823

Kimberly KUCEL, Petitioner–Appellant,

v.

NEW MEXICO MEDICAL REVIEW COMMISSION and Michael Rueckhaus, Director of the Medical Review Commission, Respondents–Appellees.

No. 19336.

Court of Appeals of New Mexico.

Jan. 24, 2000.

Certiorari Denied, No. 26,198, March 14, 2000.

Mary Lynn Bogle, Dean B. Cross, Ernest Carroll, Losee, Carson, Haas & Carroll, P.A., Artesia, for Petitioner–Appellant.

J.E. Casados, Gallagher, Casados & Mann, P.C., Albuquerque, for Respondents–Appellees.

*OPINION*

SUTIN, J.

{1} In this appeal we decide whether the Director of the New Mexico Medical Review Commission has discretion under the Medical Malpractice Act, NMSA 1978, §§ 41–5–1 through –29 (1976, as amended through 1997), to redact some of an applicant's, here Petitioner Kimberly Kucel's, legal claims and factual allegations before submitting her application to a panel for review. We hold that the Act does not give the Director that discretion. We therefore conclude that the district court erred by ruling that the Director had implicit discretion to remove issues from Petitioner's application. We also conclude that the Director should not have redacted any of Petitioner's averments or legal contentions from her application. We vacate the district court's order and reverse and remand for entry of an order requiring the Director to submit Petitioner's complete application to a panel.

## BACKGROUND

{2} Under the Act, "[n]o malpractice action may be filed in any court against a qualifying health care provider before application is made to the medical review commission and its decision is rendered." Section 41–5–15(A). The application must state "the facts of the case, nam[e] the persons involved, [and] the dates and the circumstances, so far as they are known, of the alleged act or acts of malpractice." Section 41–5–15(B)(1). Once the application is received, the Director serves a copy of the application on the health care provider involved, *see* § 41–5–16(A), and transmits the application to the health care provider's professional society, association, or licensing board, *see* § 41–5–17(A). Three specialists in the health care provider's field and three lawyers from the state bar association are then chosen to serve on a confidential panel that will review the application. *See* § 41–5–17(B). After holding a hearing on the application, the volunteer panel decides "whether there is substantial evidence that the acts complained of occurred and that they constitute malpractice[,] and . . . whether there is a reasonable medical probability that the pa-

tient was injured thereby." Section 41–5–20(A).

{3} In accordance with this procedure, Petitioner filed a written application with the Commission claiming, among other things, that her doctor committed medical malpractice by negligently failing to recognize, to properly diagnose, and to properly treat the transference and countertransference phenomena that developed during her medical and psychiatric treatment.

{4} Petitioner was initially referred to the doctor in March 1993 for treatment of hematuria. After a hysterectomy later that year, the doctor treated Petitioner for persistent diarrhea and weight loss. By mid-June 1994, Petitioner had lost a significant amount of weight. The doctor then began providing Petitioner with physical and psychological or psychiatric treatment for anorexia nervosa. The doctor billed Petitioner's insurance company for psychiatric services. Although the record is not entirely clear on this point, it appears that Petitioner's treatment by the doctor lasted into July 1994 and that the doctor continued to contact Petitioner into the fall of that year.

{5} The transference and countertransference phenomena have been described as:

> [t]he process whereby the patient displaces on to the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly. . . . A further phenomenon that may occur is countertransference, when the therapist transfers his own problems to the patient.

*St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698, 700 (Minn.1990) (citation and quotation omitted). Petitioner enumerated specific acts, including sexual acts, and omissions by the doctor as evidence from which the panel members might conclude that the doctor was negligent in failing to diagnose and treat the transference and countertransference phenomena that existed between patient and doctor.

{6} Nevertheless, the Director refused to transmit Petitioner's application to a panel. In a letter to Petitioner, the Director wrote

that he believed the doctor's intentional sexual conduct could not be considered medical malpractice and that transference and countertransference were not medically recognized phenomena. In another letter, the Director further explained that:

> [t]he [Medical Malpractice] Act ... was specifically *not* designed to have six professionals evaluate issues of alleged intentional torts including sexual misconduct.... It does not make good sense that the legislature would establish a tribunal of six volunteer professionals (rather than just six anybodys) to merely determine whether a certain professional had, or tried to have, sexual relations with a patient.

{7} The same letter went on to say that even though the Commission "would [not] be lacking volunteer panelists, I am reluctant to impose upon a panel to undertake this very questionable burden" of inquiring into an issue of intentional sexual conduct, rather than professional negligence, "unless some judge compels me to do so." After receiving this letter, Petitioner filed a petition for an alternative writ of mandamus with the district court to compel the Director to transmit her application to a panel. The district court issued the alternative writ, which ordered the Director to show cause why a peremptory writ should not be issued. After the Director answered and a hearing was held, the district court issued a "Decision" with findings of fact and conclusions of law. Ten days later, on November 24, 1997, the district court entered an order that decided that "a Partial Alternative Writ of Mandamus compelling the Director ... to set a panel hearing on only those issues of medical negligence readily apparent in the Petition ... should issue." The order also found that "the Director ... is implicitly invested with discretion as to the selection of those issues to be submitted and considered by the panel and is thus entitled to redact from the Petition any issues of claimed intentional sexual misconduct." Petitioner did not appeal the decision or order.

{8} The Director redacted all factual allegations and legal claims relating to transference and countertransference and transmitted Petitioner's application to the Commission. The redacted material included Petitioner's allegations that: the doctor called her on numerous occasions and thereby encouraged her dependence on him; the doctor told her that he was physically attracted to her; the doctor was unwilling to discontinue counseling Petitioner even after he had developed an inappropriate attraction for her; the doctor revealed information about his personal life, beliefs, and ideas about beauty during a private meal with Petitioner at a restaurant; the doctor told Petitioner that he would like to see her socially; the doctor initially refused to refer Petitioner for hospitalization, but complied with her request for hospitalization only after she threatened to obtain another doctor; the doctor kissed her on at least two occasions; the doctor engaged in oral sex with Petitioner on one occasion and attempted to engage in intercourse with her on that same occasion; the doctor repeatedly told Petitioner that he was the only physician who could care for and heal her; the doctor failed to refer Petitioner for treatment by appropriate mental health and health professionals even after he diagnosed her with a life threatening eating disorder; the doctor attempted to limit Petitioner's contact with other physicians, therapists, and psychiatrists; and Petitioner told others that the doctor was the only person with the skills necessary to cure her. Appendix A to this opinion quotes those portions of Petitioner's application that the Director redacted prior to transmitting her application to a panel.

{9} After the Director sent Petitioner's redacted application to a panel, Petitioner moved the district court for an order to show cause why the Director should not be held in contempt of court for failing to comply with the November 24, 1997, order. According to Petitioner, by redacting those portions of the application concerning the doctor's negligence in recognizing, diagnosing, and treating the transference and countertransference, the Director went beyond what the order allowed in that the Director redacted more than "issues of claimed intentional sexual misconduct," as stated in the November 24, 1997, order. On February 24, 1998, the

district court denied Petitioner's motion for an order to show cause. On March 2, 1998, Petitioner appealed from the February 24, 1998, order denying her motion for an order to show cause. Petitioner emphasized below and on appeal that the doctor's sexual conduct is not the professional negligence for which she seeks redress; rather, the doctor's negligence was his failure to diagnose and treat the transference and countertransference that developed during her treatment.

## DISCUSSION

{10} First, we address Respondents' attempt to dispose of this appeal on the grounds that Petitioner had no right to appeal from the denial of the motion for an order to show cause, and that, if this Court intends to hear the merits of the appeal, we should limit the scope of our review to the issue of whether the Director abused his discretion, and not review the issue of whether the Director had any discretion at all. Then, because we find Respondents' procedural arguments unpersuasive, we address the merits of Petitioner's appeal.

*Jurisdiction*

{11} This appeal is taken from the district court's February 24, 1998, order denying Petitioner's motion for an order to show cause. Respondents argue that we should dismiss this appeal because, according to Respondents, an order *declining* to hold a party in civil contempt is not an appealable order. Citing NMSA 1978, § 39–3–15(A) (1966), Respondents argue that only persons held in contempt have a right of appeal. In making this argument, Respondents fail to give adequate consideration to applicable constitutional, statutory and common-law principles. Respondents also misconstrue Section 39–3–15(A).

{12} Our state constitution guarantees an aggrieved party an "absolute right to one appeal." N.M. Const. art. VI, § 2 (1965). This constitutional guarantee has been imple-mented by the Legislature through NMSA 1978, §§ 39–3–2 (1917, as amended 1966) (providing for appeal by "any party aggrieved" by "final order after entry of judgment which affects substantial rights") and 34–5–8(A)(1) (1966, as amended through 1983) (vesting appellate jurisdiction in court of appeals to review "any civil action not specifically reserved to the jurisdiction of the supreme court"). Contempt proceedings are a principal means of enforcing mandatory orders such as injunctions or writs of mandamus. 42 Am.Jur.2d, *Injunctions* § 339 (1969); 52 Am.Jur.2d., *Mandamus* § 482 (1970). "Civil contempts are those proceedings instituted to preserve and enforce the rights of private parties to suits and to compel obedience to the orders, writs, mandates and decrees of the court...." *In re Klecan*, 93 N.M. 637, 638, 603 P.2d 1094, 1095 (1979). As a practical matter, a party who has obtained a mandatory order such as a writ of mandamus, but subsequently is wrongfully denied enforcement, may be just as "aggrieved" as a party who is wrongfully denied the order in the first place. We note that on at least two prior occasions, the New Mexico Supreme Court—albeit without discussing the basis of its jurisdiction—has entertained appeals from orders declining to hold a party in contempt. *See Nesbit v. Nesbit*, 80 N.M. 294, 454 P.2d 776 (1969); *Ingalls v. Ingalls*, 119 N.M. 85, 888 P.2d 967 (1994).

{13} In addition to our general grant of appellate jurisdiction over civil cases, the Legislature in Section 39–3–15(A) has specifically provided for appeal to this Court from judgments in civil contempt proceedings:

*Any person aggrieved by the judgment of the district court in any proceeding for civil contempt* and any person convicted of criminal contempt except criminal contempt committed in the presence of the court *may appeal within thirty days from the judgment* [or] [1] conviction to the su-

---

1. We recognize that NMSA 1978, § 39–3–15(A) (1966) refers to "judgment *of* conviction," rather than "judgment *or* conviction" as set out in the text above. The substitution of "of" for "or" occurred in Laws 1966, ch. 28, § 43. Prior to that time, both the predecessor statute, C.S.1929, § 105–2502 (1917) and the corresponding Supreme Court Rule, NMSA 1953, § 21–2–1(5) referred to "judgment *or* conviction." We are satisfied that the substitution of "of" for "or" in the course of the 1966 recompilation represents a typographical error rather than a deliberate sub-

preme court or the court of appeals, as appellate jurisdiction may be vested by law in these courts. . . .

(Emphasis added). We view the statutory distinction between "any person *aggrieved*" (in the case of proceedings for *civil* contempt) as opposed to "any person *convicted*" (in the case of criminal contempt) as an indication of the Legislature's intention to extend the right of appeal in civil contempt proceedings to persons such as Petitioner who have unsuccessfully sought enforcement of an order through a contempt proceeding.

{14} Petitioner was an aggrieved party for purposes of appellate jurisdiction inasmuch as the order denying her motion to show cause effectively precluded Petitioner from presenting her theory of malpractice involving transference/countertransference to a panel. We conclude that jurisdiction to review the district court's February 24, 1998, order is conferred by our general grant of civil appellate jurisdiction as well as by the specific grant of jurisdiction applicable to civil contempt proceedings.

*Scope of Review*

{15} Petitioner argues that the issue of whether the district court erred in ruling that the Director had implicit discretion to delete portions of her application was appropriately brought up for review by her appeal from the February 24, 1998, order denying her motion for an order to show cause. Respondents argue that the only issue properly before this Court is whether the Director abused his discretion under the November 24, 1997, order. According to Respondents, Petitioner waived the right to appeal the issue of whether the Act vests the Director with discretion when Petitioner failed to appeal within thirty days from the November 24, 1997, order granting the writ of mandamus. Respondents argue that in view of

Petitioner's failure to appeal the November 24, 1997, order, that order conclusively established as the law of this case that the Director is vested with implicit discretion to review and redact applications.

{16} We agree with Respondents that the November 24, 1997, order granting the writ of mandamus was a final, appealable order. An order is final if it includes "decretal language that carries the decision into effect by ordering that something happen." *Khalsa v. Levinson,* 1998–NMCA–110, ¶ 13, 125 N.M. 680, 964 P.2d 844. The order entered in this case determined that "a Partial Alternative [sic][2] Writ of Mandamus compelling the Director of the New Mexico Medical Review Commission to set a panel hearing on only those issues of medical negligence readily apparent in the Petition filed with the Commission by Kimberly Kucel should issue[.]" This decretal language granting a writ of mandamus rendered the November 24, 1997, order a final judgment for purposes of appeal. *See* 52 Am.Jur.2d, *Mandamus* § 471 (1970) (discussing formal requirements of judgment in mandamus proceeding). "[I]n all cases of proceedings by mandamus in any district court of this state, the final judgment of the court thereon shall be reviewable by appeal or writ of error in the same manner as now provided by law in other civil cases." NMSA 1978, § 44–2–14 (1899); *see also Hart v. City of Albuquerque,* 1999–NMCA–043, ¶ 16, 126 N.M. 753, 975 P.2d 366 ("A final judgment on a writ of mandamus is reviewable on appeal."); 52 Am.Jur.2d *Mandamus* § 491 (1970) (explaining that an appeal lies from the judgment granting or denying a peremptory writ).

{17} We disagree, however, with Respondents' suggestion that our hands are tied by the district court's unappealed November 24, 1997, order. Assuming, without deciding[3], that Petitioner's failure to appeal

stantive change in this provision. *See New Mexico Glycerin Co. v. Gallegos,* 48 N.M. 65, 145 P.2d 995 (1944) (construing substitution of "of" for "or" as "patently a typographical error"); *see also State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994) (noting with approval rule that typographical errors in a statute may be disregarded so that statute may be

interpreted in manner that elucidates true meaning).

2.  The trial court appears to have meant a partial *peremptory* writ of mandamus. *See* NMSA 1978, § 44–2–12 (1884).

3.  Respondents have provided no authority to support their position that the law of the case

the November 24, 1997, order established as the law of the case the Director's discretion to redact applications, it is well-settled that the law of the case doctrine is flexible and discretionary, *see State v. Breit*, 1996–NMSC–067, ¶ 12, 122 N.M. 655, 930 P.2d 792, and does not require us "to uphold a clearly incorrect decision." *Trujillo v. City of Albuquerque*, 1998–NMSC–031, ¶ 41, 125 N.M. 721, 965 P.2d 305. The law of the case doctrine allows—but does not require—courts to refuse to consider matters already decided in the case. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 802, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) ("[T]he doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit on their power."); *Breit*, 1996–NMSC–067, ¶ 12, 122 N.M. 655, 930 P.2d 792.

**{18}** For reasons explained below, we believe the district court's determination that the Director has implicit discretion is manifestly erroneous and clearly contrary to the Act. If we were to apply the law of the case doctrine here, we would be forced to address the question whether the Director's conduct was an abuse of discretion when our own review of the Act convinces us he has no discretion. To attempt to decide whether the Director has abused his discretion when it is clear to us that the Director has no discretion would be a futile exercise. "[W]hen we conclude that a former decision is erroneous, and we still have the opportunity to correct it as affecting those parties whose interests are concerned in the original ruling, we should apply the law of the land rather than the law of the case." *Farmers' State Bank v. Clayton Nat'l Bank*, 31 N.M. 344, 355, 245 P. 543, 548 (1925), *quoted with approval* in *Reese v. State*, 106 N.M. 505, 506, 745 P.2d 1153, 1154 (1987). Thus, we may exercise our discretion to determine and apply the law of the land—the law as the Legislature wrote it and intended it. We

doctrine prevents us from considering the issue whether the Director has discretion under the Act. As a result, and because we conclude that this case falls within the manifest-error exception to the law of the case doctrine, and we are not presented with a case in which the very applicability of the doctrine is dispositive, we decline to

note that in the present case doing so merely serves to inform a public servant, the Director, of his duties under the law. *See Farmers' State Bank*, 31 N.M. at 356, 245 P. at 548 ("As affects the parties concerned, the evil effects of [not following the law of the case] are trivial as compared to the unfortunate consequences of perpetuating the error.").

**{19}** As a final procedural matter, we note that to the extent that Respondents imply that Petitioner did not preserve the argument that the Director has no discretion, they are incorrect. Prior to issuance of the order, Petitioner argued that the Director had no discretion to redact her claims and averments. Thus, neither the law of the case doctrine nor our preservation requirement limits Petitioner to arguing that the Director abused his discretion in this case, and we may properly decide whether the Act affords the Director discretion to make redactions before submitting an application to a panel. We now turn to the merits of Petitioner's case.

*The Director Has No Discretion to Redact Legal Claims and Factual Allegations From an Application*

**{20}** The Act created the Commission "to provide panels to review all malpractice claims against health care providers covered by [the Act]." Section 41–5–14(A). The panels "consider ... all cases involving *any* alleged act of malpractice occurring in New Mexico." Section 41–5–14(C) (emphasis added). The panels also decide "whether there is substantial evidence that the acts complained of occurred *and that they constitute malpractice*." Section 41–5–20(A) (emphasis added). Under these sections of the Act, it is the duty of the panels—not the Director—to consider all malpractice claims and to determine whether the allegations in these claims amount to malpractice as it is defined under the Act.

address the issue of the extent to which a party's failure to appeal a ruling may justify application of the law of the case doctrine to that issue. *Cf. United States v. Escobar–Urrego*, 110 F.3d 1556 (11th Cir.1997) (noting failure to appeal issue; applying law of case; concluding that no exceptions to law of case doctrine apply).

{21} The Director initiates the panel's review of an application by promptly transmitting the application to the health care provider involved, *see* § 41–5–16(A), and to the professional society, association, or licensing board to which the health care provider belongs, *see* § 41–5–17(A), (B). The Director fixes the date, time, and place of the hearing on the application, *see* § 41–5–18, and chairs the panel, *see* § 41–5–17(F). In cases involving multiple health care providers, the Director has discretion to assign a single panel to review the claims against all of the providers or to assign a panel for each individual provider. *See* § 41–5–17(C). If the panel concludes that the applicant presented substantial evidence that the events alleged actually occurred and that they constitute malpractice, then the Director signs the panel's decision and assists the applicant in retaining an expert who will help prepare the case and appear as a witness. *See* § 41–5–23. If the panel is evenly divided as to whether the applicant has presented substantial evidence, then the Director casts the deciding vote. *See* § 41–5–20. Aside from voting in the case of a tie and perhaps deciding whether to assign one or more panels, the Director's duties are limited, ministerial duties.

{22} The Act does not expressly grant the Director any discretion to redact portions of an application or to withhold an application or any part of an application from a panel. Nevertheless, the Director appears to believe that such discretion is necessary in order to avoid convening volunteer panels for what he believes to be frivolous claims. Although reading some discretion into the statute might shrink the workload of the volunteers who serve on the panels, we believe that doing so would allow the Director to usurp the panel's express functions. Allowing the Director to screen applications and unilaterally eliminate portions of applications before sending them to a panel is akin to allowing the Director to act as a judge deciding a motion for failure to state a claim upon which relief may be granted. The Director has no such decision-making authority or discretion under the Act. The Director has authority to decide issues related to the merits of the application in only one limited circumstance: breaking a tie *after* a panel has considered an application. As to all substantive matters concerning malpractice, the Legislature expressly gave decision-making authority to the panels, not the Director. We cannot glean from the Act implicit discretion to redact averments in applications; nor will we read into the Act such authority. We see no reasonable basis for determining that the Legislature intended to grant such discretion out of a concern that without such discretion claimants would burden volunteer panels with frivolous claims. Additionally, allowing the Director to eliminate claims and averments would subvert an important purpose of the Act, which is to assist a prevailing applicant in "retaining a physician qualified in the field of medicine involved." *See* § 41–5–23.

{23} We conclude that the Director does not have any discretion to redact an applicant's legal claims or factual averments from an application to the Commission. In reaching this decision, we intimate no opinion as to whether failure to diagnose or treat transference and countertransference constitutes malpractice or whether the specific events in this case rise to the level of malpractice.

## CONCLUSION

{24} We conclude the Director had no discretion to redact portions of Petitioner's application before submitting her application to the panel. We vacate the district court's order and reverse and remand for entry of an order requiring the Director to submit Petitioner's complete application to a panel. Petitioner is awarded her costs on appeal.

{25} **IT IS SO ORDERED.**

ALARID and APODACA, JJ., concur.

## APPENDIX A

The Director redacted the following from Petitioner's application:

[The doctor] telephoned Ms. Kucel on a regular basis while she was at home, inquired about her condition, and indicated to Ms. Kucel that he was seriously concerned about her welfare. The manner, contact, and frequency of contact by [the

doctor] with Ms. Kucel, caused Ms. Kucel to develop a dependence upon [the doctor] beyond that of a physician treating a physical ailment. [The doctor] developed a personal attraction for Ms. Kucel and used the telephone calls to check on Ms. Kucel's condition as a subterfuge to feed his personal attraction.

. . . [The doctor] failed to recognize that Ms. Kucel totally relied on [him] . . . .

. . . .

. . . [The doctor] was negligent in continuing to counsel Ms. Kucel after he had developed an inappropriate attraction for Ms. Kucel.

. . . During each succeeding appointment, [the doctor's] attraction for Ms. Kucel escalated from telling her how beautiful she was to hugging her, to kissing her, and to continuing telephone calls to Ms. Kucel at her home.

After one of the appointments, [the doctor] asked Ms. Kucel to have lunch with him. [The doctor] told Ms. Kucel to meet him at the Stevens Motel in Carlsbad. During lunch, [the doctor] talked about family, religion, religious revivals, and about [his] concept of beauty and how he thought a little extra weight would make Ms. Kucel more attractive. [The doctor] was drinking wine, offered some wine to Ms. Kucel, but Ms. Kucel refused.

After lunch, [the doctor] went to the car with Ms. Kucel. [The doctor] and Ms. Kucel stood by Ms. Kucel's car. Ms. Kucel thanked [him] for lunch. [The doctor] indicated that he wanted to see her again and felt that he could help her with her problem. Ms. Kucel did not respond either affirmatively or negatively.

. . . .

While admitting Ms. Kucel to the hospital, [the doctor] told[ ] Ms. Kucel's husband . . . that [he] had better not bring Ms. Kucel back in this condition again or she could die and that [he (the doctor) ] was the only one that could save her. [The doctor], upon Ms. Kucel's dismissal from Guadalupe Medical Center, resisted Mr. Kucel's efforts to get Ms. Kucel admit-

ted to Charter Hospital. Only after Mr. Kucel threatened to get another physician to be the referring physician, did [the doctor] agree to be the referring physician.

. . . [During her hospitalization, the doctor] came into Ms. Kucel's room one evening, french-kissed Ms. Kucel, and told her how much he cared for her.

After Ms. Kucel was released from Guadalupe Medical Center the second time, [the doctor] continued to call Ms. Kucel at home. The telephone calls had at this point, evolved into personal conversations in which [the doctor] expressed his attraction for Ms. Kucel. [He] told Ms. Kucel [that] he wanted to see her and tried to give Ms. Kucel a number for her to reach him.

Ms. Kucel finally contacted [the doctor] at his office to tell [him] to not call her at home anymore. [The doctor] told Ms. Kucel to meet him at his office on a Saturday. When Ms. Kucel arrived, [the doctor] met Ms. Kucel in the parking lot. [The doctor] directed Ms. Kucel to [his] office. When Ms. Kucel entered [his] office, [the doctor] backed Ms. Kucel up against the door, began to french kiss her and leaned her up against the reception desk.

Ms. Kucel, wanting to get away from the office, suggested going for coffee. [The doctor] then suggested that he knew where they could go. Ms. Kucel followed [the doctor] in her car. [The doctor] drove to the country, back to town, and eventually to a motel in Carlsbad. [The doctor] registered and invited Ms. Kucel to the room. After [she] entered the motel room, [the doctor] offered Ms. Kucel some wine, undressed himself and undressed Ms. Kucel. However, when both parties were naked, [the doctor] noticed that Ms. Kucel was very thin and covered with bruises and attempted but was unable to consummate intercourse. [The doctor] directed Ms. Kucel to perform oral sex on him and also performed oral sex on Ms. Kucel.

After the incident at the motel, Ms. Kucel called [the doctor] and told him she was sorry that she wasn't what he expected. [The doctor] told Ms. Kucel that she had

done fine and he was the only [one who] could take care of her and heal her.

[The doctor] expressed at the time of the second hospitalization to both Ms. Kucel and Mr. Kucel, that Ms. Kucel's eating disorder was life-threatening because of Ms. Kucel's inability to cope with self image and the underlying psychological problems which were responsible for her eating disorder. Following Ms. Kucel's dismissal from the hospital and after the sexual contact with Ms. Kucel, [the doctor] continued to telephone Mr. [sic-Ms.] Kucel at home and inquire about her condition but failed to follow up his treatment of [her] by referring [her] to other health professionals that could treat [her] serious and life threatening psychological problems.

... [The doctor] embarked on a course of treatment to build on Ms. Kucel's self-esteem by inviting her to lunch, hugging [her], kissing [her], making remarks about how her appearance would be improved by additional weight and eventually attempting intercourse with her. [The doctor's] attempt to treat Ms. Kucel's self-esteem interfered with and detrimentally affected the psychiatric treatment provided by [another doctor].

. . . .

During the fall of 1994, [the doctor] continued to call Mr. [sic-Ms.] Kucel on a regular basis to inquire about Ms. Kucel's condition and to request copies of [her] medical records at Charter. [The doctor] continued to try to advise Mr. [sic-Ms.] Kucel and influence [her] treatment ..., until informed by [another doctor], who was then Ms. Kucel's treating psychologist, that Ms. Kucel had disclosed [the doctor's] abuse, including [his] statements to Ms. Kucel that he was the only one that could help [her] and that without him, Ms. Kucel would perish.

... arising from [the doctor's] abuse . . . .

[The doctor's] attempts to limit Ms. Kucel's contact with other physicians, therapists, and psychiatrists was a last desperate attempt ... to continue control of Ms. Kucel and [the doctor's] method of treat-

ment. [The doctor's] treatment of Ms. Kucel's self-esteem via hugging ...., kissing ...., commenting on Ms. Kucel's beauty being enhanced by increased weight, and by attempting to enhance Ms. Kucel's perception of her sexual desirability by having intercourse with Ms. Kucel was an act of malpractice.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

... Ms. Kucel's perception of [the doctor] as the sole person with skill necessary to cure her, caused a transfer of inappropriate feelings to [the doctor] .... this transference.

. . . .

. . . .

[The doctor] was negligent in attempting to control the treatment of Ms. Kucel and prevent discovery of his abuse even up until the time Ms. Kucel was dismissed from Charter Hospital as an in-patient;

[The doctor] was negligent in the care and treatment of Ms. Kucel by failing to recognize that Ms. Kucel had transferred feelings to [him];

[The doctor] was negligent in the care and treatment of Ms. Kucel by failing to properly treat Ms. Kucel's transference of her feelings toward [the doctor] once the transference occurred;

[The doctor] was negligent in the care and treatment of Ms. Kucel by failing to recognize and treat his counter-transference of inappropriate feelings for Ms. Kucel and burdened Ms. Kucel with [his] inappropriate feelings.